The KING'S GARDEN, INC., Petitioner

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents

No. 73–1896.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 1974.

Decided May 6, 1974.

Morton L. Berfield, Washington, D. C., with whom Lewis I. Cohen, Washington, D. C., was on the brief, for petitioner.

John E. Ingle, Counsel, F. C. C., with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., were on the brief, for respondent.

Melvin L. Wulf, New York City, and Joseph Remcho, San Francisco, Cal., filed a brief on behalf of American Civil Liberties Union et al. as amici curiae.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and WYZANSKI,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

Petitioner is a non-profit, interdenominational, religious, and charitable organization. Its activities include a number of ministries whose basic goal is to "share Christ world wide" (Record at p. 15). Petitioner is also the licensee of Radio Stations KBIQ–FM and KGDN in Edmonds, Washington. In these proceedings it seeks review of an order of the Federal Communications Commission which found that it was discriminating on religious grounds in its employment practices and directed it to submit to the Commission a statement of its future hiring practices and policies.[1] Petitioner relies upon a 1972

---

\* Of the United States District Court for the District of Massachusetts, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. This controversy arose when a job applicant at one of King's Garden's stations complained to the FCC that he was asked questions such as "Are you a Christian?", "Is your spouse a Christian?", and the like. The Commission forwarded the complaint to King's Garden on Aug. 2, 1971 (Record at p. 2). King's Garden responded by claiming the statutory and constitutional right to discriminate on religious grounds with respect to all positions of employment at its radio stations (Record at p. 15). The Commission ruled on May 3, 1972 that only "those persons hired to espouse a particular religious philosophy over the air should be exempt from the non-discrimination rules." In Re Complaint by Anderson, 34 FCC2d 937, 938 (1972). This position was reaffirmed after enactment of the 1972 exemption to the Civil Rights Act mentioned in text. See In the Matter of King's Garden, Inc., 38

amendment to Title VII of the 1964 Civil Rights Act which exempts all activities of any "religious corporation, association, educational institution, or society" from the Act's ban on religious discrimination in employment.[2] (Hereinafter the 1972 exemption.) Before 1972 only the "religious activities" of such organizations had been exempted.[3] Petitioner would require the Federal Communications Commission to engraft the 1972 exemption on to the Commission's own rules against sectarian employment practices, promulgated under the "public interest" standard of the Communications Act.[4] The Commission already ex-

empts employment "connected with the espousal of the licensee's religious views."[5] Petitioner contends that a sectarian licensee, like itself, must be allowed to discriminate on religious grounds in all of its employment practices.

We affirm the Commission rulings. The 1972 exemption is of very doubtful constitutionality, and Congress has given absolutely no indication that it wished to impose the exemption upon the FCC. Under these circumstances the Commission is fully justified in finding that the exemption does not control its "public interest" mandate under

---

FCC2d 339 (1972). The question in this case is whether the Commission's qualified exemption facially conforms to relevant statutes and the Constitution. We do not deal with application of the exemption to any particular job position at King's Garden. It should be noted that King's Garden has requested institution of rule-making proceedings on the Commission's exemption policy. This issue is not before us.

2. The exemption is in § 3 of the Equal Employment Opportunities Act of 1972, Pub.L. 92–261, 86 Stat. 103, 42 U.S.C. § 2000e–1 (Supp. II 1972), amending § 702 of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, former 42 U.S.C. § 2000e–1. The 1972 exemption reads, in pertinent part:

> This subchapter shall not apply * * * to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

The general ban on religious discrimination in employment is at 42 U.S.C. § 2000e–2 (1970).

3. Section 702 of the 1964 Civil Rights Act read, in pertinent part:

> This subchapter shall not apply * * * to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities * * *.

4. The regulations bar employment discrimination by broadcast licensees "because of race, color, religion, national origin or sex." 47 C.F.R. §§ 73.125(a), 73.301(a), 73.599(a), 73.680(a), 73.793(a) (Oct. 1, 1973). The

Communications Act of 1934, 48 Stat. 1064 et seq., 47 U.S.C. § 151 et seq. (1970), mandates the Commission to regulate broadcast licensees "as public convenience, interest, or necessity requires." E.g., 47 U.S.C. §§ 303, 307, 309(a). The Commission traces its authority to promulgate fair employment rules to the "public interest" standard of its enabling act and to the related fact that broadcasters are "public trustees" with special obligations. See Non-Discrimination in Employment Practices: Notice of Proposed Rule Making, 13 FCC2d 766, 769–770 (1968), and Non-Discrimination in Employment Practices, 18 FCC2d 240, 241 (1969). The Communications Act does not itself expressly grant the FCC authority to regulate the employment practices of licensees, but the Commission has noted that employment practices have an obvious, if indirect, impact on programming—over which the FCC does have express authority. See Non-Discrimination in Employment Practices: Notice of Proposed Rule Making, supra, 13 FCC2d at 770. King's Garden does not deny that the Commission has independent statutory authority to regulate the employment practices of licensees, and contends only that this authority cannot be exercised contrary to the Constitution or to the "national policy" established by the religious exemption in § 3 of the Equal Employment Opportunities Act of 1972. Brief for petitioner at 18. The Commission has stated that any change in its anti-bias rules should be accomplished through formal rule-making and should be adopted only "upon a public interest finding under the Communications Act" (Record at p. 83).

5. See In Re Complaint by Anderson, supra note 1, 34 FCC2d at 938, and In Re Request of National Religious Broadcasters, Inc., 43 FCC2d 451 (1973).

the Communications Act. The limited exemption which the FCC currently recognizes to its own anti-bias rules adequately protects a sectarian licensee's rights under the Communications Act and the First Amendment. Accordingly we uphold the Commission's regulatory scheme as facially sound, while recognizing that its future application will require continuing judicial scrutiny.

I

The sponsors of the 1972 exemption were chiefly concerned to preserve the statutory power of sectarian schools and colleges to discriminate on religious grounds in the hiring of all of their employees.[6] But the exemption's simple and unqualified terms obviously accomplish far more than this. In covering all of the "activities" of any "religious corporation, association, educational institution, or society," the exemption immunizes virtually every endeavor undertaken by a religious organization. If a religious sect should own and operate a trucking firm, a chain of motels, a race track, a telephone company, a railroad, a fried chicken franchise, or a professional football team, the enterprise could limit employment to members of the sect without infringing the Civil Rights Act.[7]

6. Section 702 of the 1964 Civil Rights Act (Pub.L. 88–352, 78 Stat. 255, former 42 U.S.C. § 2000e–1) had exempted "educational institution[s]" from all of the Act's employment discrimination rules. Early versions of the legislation which became the Equal Employment Opportunities Act of 1972 deleted this blanket exemption for educational institutions and proposed to add "religious educational institution[s]" to the list of religious organizations which § 702 had exempted as to religious discrimination in "religious activities." See § 3 of S. 2515, 92nd Cong., 1st Sess., Sept. 14, 1971. Senator Allen objected that

> [u]nder the provisions of the bill, there would be nothing to prevent an atheist being forced upon a religious school to teach some subject other than theology.

Legislative History of the Equal Opportunity Act of 1972 844 (Nov. 1972). To remedy this evil the Senators proposed striking the word "religious" from the term "religious activities" used in the provision exempting religious organizations from the ban on sectarian hiring practices. Amendment 809 to S. 2515, Legislative History, supra, at 789. The Senate adopted the Ervin-Allen amendment, id. at 1667, and the House also accepted it after a Joint Conference on the 1972 Act, id. at 1813–1814. This amendment broadened the exemption as to religious educational institutions—but also, of course, as to all other religious organizations listed in the exemption. In giving concrete examples of the workings of their amendment, however, both Senator Allen and Senator Ervin invariably adverted to its effect on religious educational institutions. Id. at 846, 848–852. The effect on other religious organizations went undiscussed, except for two very general comments by Senator Ervin:

> Our amendment would strike out the word "religious" and remove religious institu-

tions in all respects from the subjugation to the EEOC.

Id. at 848.

> In other words, this amendment is to take the political hands of Caesar off of the institutions of God, where they have no place to be.

Id. at 1645.

7. See note 9 infra. It might be argued, in an attempt to read the exemption narrowly, that a commercial enterprise established by a religious sect is not an "activity" of the sect. This does not, however, seem a very fruitful line of argument. If a sect owns and operates an enterprise, on what ground could it be held to be other than an "activity" of the sect? Use of some technical ground—such as separate incorporation of the commercial enterprise—would not narrow the exemption in practice, for religious groups would simply avoid the technicality, e.g., avoid separate incorporation, in setting up their commercial enterprises. To effect a substantive narrowing of the exemption the courts would have to attempt to divide a sect's various undertakings into "secular" and "religious" categories, but it is precisely this categorization which Congress repudiated in 1972.

While it is not uncommon for courts to come very close to rewriting statutes so as to save their constitutionality, the 1972 exemption is a poor candidate for such a salvage operation. The scope of a religious exemption is an issue raising very delicate questions of public policy. While it is reasonably clear that the 1972 exemption violates the Establishment Clause, it is far less clear exactly how much, or in what way, the exemption should be narrowed to avoid First Amendment objections. There may well be a considerable range of permissible alternatives. As a matter of institutional compe-

If owned and operated by a nonreligious organization, the enterprise could not use sectarian criteria in hiring, except where the particular job position carried a "bona fide occupational qualification" of a religious character.[8]

█ In creating this gross distinction between the rules facing religious and non-religious entrepreneurs, Congress placed itself on collision course with the Establishment Clause. Laws in this country must have a secular purpose and a "primary effect" which neither advances nor inhibits religion. Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 773, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Walz v. Tax Commission, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

> [I]t is now firmly established that a law may be one "respecting an establishment of religion" even though its consequence is not to promote a "state religion," * * * and even though it does not aid one religion more than another but merely benefits all religions alike. * * *

*Nyquist, supra,* 413 U.S. at 771.

> A given law might not *establish* a state religion but nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment * * *.

Lemon v. Kurtzman, *supra,* 403 U.S. at 612 (emphasis in original). We cannot conceive what secular purpose is served by the unbounded exemption enacted in 1972. As for "primary effect," the exemption invites religious groups, and them alone, to impress a test of faith on job categories, and indeed whole enter-prises, having nothing to do with the exercise of religion.

It is true that most of the Establishment Clause cases recently before the Supreme Court have involved state subsidies or tax preferences for religious groups. But in drafting the Clause the Founders were taking equally keen aim at all non-financial "sponsorship" of religious organizations by government. Lemon v. Kurtzman, *supra,* 403 U.S. at 612; Walz v. Tax Commission, *supra,* 397 U.S. at 668. And sponsorship is what this exemption accomplishes. It is a sure formula for concentrating and vastly extending the worldly influence of those religious sects having the wealth and inclination to buy up pieces of the secular economy.[9]

█ It was not, of course, constitutionally required that Congress prohibit religious discrimination in private sector employment. But this having been done, by the Civil Rights Act, the wholesale exemption for religious organizations alone can only be seen as a special preference. *Compare* Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). The First Amendment demands "neutrality" of treatment between religious and non-religious groups. *Nyquist, supra,* 413 U.S. at 792–793. As Mr. Justice Harlan once noted:

> Neutrality in its application requires an equal protection mode of analysis. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerry manders. * * *

Walz v. Tax Commission, *supra,* 397 U. S. at 696 (concurring opinion). ⚹

---

8. 42 U.S.C. § 2000e–2(e)(1). The "qualification" must be "reasonably necessary to the normal operation of that particular business or enterprise."

tence and constitutional authority, it is for the Congress, not the courts, to choose among these. *See,* in this regard, 26 U.S.C. §§ 501(c)(3), 502, 511, & 512 (1970), where Congress has shown considerable ingenuity in constructing a very complicated exemption from the income tax laws for certain religious corporations.

9. The wealth and inclination exist, apparently, in many American religious groups. *See* A. Balk, The Religion Business 8–11 (1968); D. Robertson, Should Churches Be Taxed? 139–170 (1968); M. Larson & C. Lowell, Praise the Lord for Tax Exemption 193–246 (1969).

Because the two religion guarantees often seem to tug in opposite directions, "neutrality" is a notoriously difficult concept.

A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion. * * * The Court must not ignore the danger that an exemption from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause, but that danger cannot be allowed to prevent any exception no matter how vital it may be to the protection of values promoted by the right of free exercise. * * * Wisconsin v. Yoder, 406 U.S. 205, 220–221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972). *See also* Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In this matter of exemptions the First Amendment strings a "tight rope" between the two religion guarantees, Walz v. Tax Commission, *supra,* 397 U.S. at 672, and we must see to it that Congress does not slip off.

■ From 1964 to 1972 Congress had, in our view, a firm purchase on the tightrope. The exemption then granted by the Civil Rights Act to the *religious* activities of religious organizations was itself required by the First Amendment. The Free Exercise Clause precludes governmental interference with ecclesiastical hierarchies, church administration, and appointment of clergy. *See* Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); McClure v. Salvation Army, 5 Cir., 460 F.2d 553 (1972). In addition, the guarantees of Free Exercise, Free Speech, and Free Press no doubt combine to provide a religious group the right to choose on sectarian grounds those who will advocate, defend, or explain the group's beliefs or way of life, either to its own members or to the world at large. *See* Tucker v. Texas, 326 U.S. 517, 66 S.Ct. 274, 90 L.Ed. 274 (1946); Follett v. McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Founding Church of Scientology v. United States, 133 U.S. App.D.C. 229, 409 F.2d 1146, cert. denied, 396 U.S. 963, 90 S.Ct. 434, 24 L. Ed.2d 427 (1969); Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S. App.D.C. 146, 403 F.2d 169 (1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969). *Compare* Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Mitchell v. Pilgrim Holiness Church Corp., 7 Cir., 210 F.2d 879, cert. denied, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954).

■ But the 1972 exemption now shelters myriad "activities" which have not the slighest claim to protection under the Free Exercise, Free Speech, or Free Press guarantees. It is arguable that Congress may, without violating the Establishment Clause, expand a religious exemption *somewhat* beyond the minimal boundaries created by the several First Amendment liberties. *See* Walz v. Tax Commission, *supra* (property tax exemption for buildings and land used "exclusively for religious, educational or charitable purposes" and "not operating for profit"); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) ("released time" exemption from school attendance requirement for students wishing to take religious instruction). *See also* Sherbert v. Verner, *supra,* 374 U.S. at 422–423 (dissenting opinion of Mr. Justice Harlan). But these isolated decisions create no precedent for the unlimited 1972 exemption. In *Zorach, supra,* the Court carefully confined its ruling to the facts of the case. In *Walz, supra,* the Court stressed the peculiar historical role of property tax exemp-

tions for places of worship, 397 U.S. at 676–678, noted that the tax exemption extended to the non-profit activities of many secular organizations so that the statutory classification was not strictly a "religious" one, *id.* at 673, and carefully refrained from stating or implying that the state could exempt church-owned property used for non-religious, commercial purposes. (The Court has yet to address this last question. *See* Diffenderfer v. Central Baptist Church, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972); *cf.* Gibbons v. District of Columbia, 116 U.S. 404, 408, 6 S.Ct. 427, 29 L.Ed. 680 (1886).)

By contrast, no historical tradition supports the 1972 exemption, *see Nyquist, supra,* 413 U.S. at 791–792. That exemption obviously creates a classification of a strictly religious character, *id.* And the exemption's benefits clearly extend to the non-religious, commercial enterprises of sectarian organizations.[10] It is conceivable that there are "many areas in which the pervasive activities of the State justify some special provision for religion to prevent it from being submerged by an all-embracing secularism." Sherbert v. Verner, *supra,* 374 U.S. at 422 (dissenting opinion of Mr. Justice Harlan). But it hardly follows that the state may favor religious groups when they themselves *choose* to be submerged, for profit or power, in the "all-embracing secularism" of the corporate economy.

In addition to being vulnerable on First Amendment grounds, the 1972 exemption appears unconstitutional on Fifth Amendment grounds as well. To the extent that the non-religious commercial enterprises of religious organizations directly compete with those of non-religious organizations, the 1972 exemption forces the Government to discriminate between business rivals in applying the Civil Rights Act's constraints upon sectarian hiring. The criterion of discrimination—*i.e.* the religious or nonreligious character of the owning or operating group—not only lacks a rational connection with any permissible legislative purpose, but is also inherently suspect. Such invidious discrimination violates the equal protection of the laws guaranteed by the Due Process Clause. *Compare* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1947).

II

The FCC's own rules against sectarian hiring, promulgated under the Communications Act, exempt employment "connected with the espousal of the licensee's religious views."[11] Petitioner finds in this formula insufficient compliance with the "national policy" established by the 1972 exemption to the Civil Rights Act. But it is very dangerous indeed to inflate a constitutionally doubtful statute into a "national policy" having force beyond the statute's literal command. The customary, and more prudent, course is to construe statutes so as to avoid, rather than aggravate, constitutional difficulties. *See* United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). This course is open to us in the present case. Neither the express terms nor the legislative history of the 1972 exemption indicate that Congress intended the FCC to carve a like exemption into its own anti-bias rules. A definitive resolution of the constitutional issues raised by the 1972 exemption can

10. In Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Court also noted that a tax exemption for property used for religious purposes had the virtue of minimizing "entanglement" between churches and state authorities, *id.* at 674. But this rationale was obviously not intended to sanction *every* exemption from general laws granted to the "activities" of a religious organization. If it were, no "religious" exemption would ever raise an Establishment Clause issue; the Court has never adopted such a simpleminded rule. *See* Wisconsin v. Yoder, 406 U.S. 205, 220–221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), *and* Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

11. *See* note 5 *supra.*

therefore be deferred to a case where they are squarely raised.

■ While the key term in the 1972 exemption—"activities"—is concededly broad enough to cover broadcasting franchises operated by religious organizations, this means only that these sectarian franchises are immune from the ban on religiously discriminatory hiring contained in the Civil Rights Act. It does not necessarily follow that Congress intended to abrogate the FCC's own anti-bias rules. Not only have these rules always been promulgated under the Communications Act, rather than the Civil Rights Act, but the rules have also, from their inception, gone beyond the commands contained in the Civil Rights Act. For instance, the FCC demands that its licensees take strong affirmative steps to hire members of minority groups [12]; and the FCC's rules apply to every broadcaster —even those too small to fall within the coverage of the civil rights statutes.[13] The Commission's extensive rules, and limited religious exemption, were in full force when Congress debated the 1972 exemption from the Civil Rights Act, but the legislative history makes absolutely no mention of them, of the FCC, or of the Communications Act. In this context we adhere to the

> venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction. * * *

Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L. Ed.2d 371 (1969) (footnote omitted). This principle has particular application to the FCC, for the Commission's mandate "to assure that broadcasters operate in the public interest is a broad one, a power 'not niggardly but expansive,'" *id.* at 380. *See also* FCC v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); National Broadcasting Co. v. United States, 319 U.S. 190, 218–219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 137–138, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

An agency should, of course, always examine new legislation to determine its relevance, if any, to the agency's mandate. *See* McLean Trucking Co. v. United States, 321 U.S. 67, 80, 64 S.Ct. 370, 88 L.Ed. 544 (1944). *Cf.* City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956); Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 107, 180 F.2d 28, 33 (1950). But, having done this, the Commission was justified in finding the 1972 exemption irrelevant to its regulation of broadcast licensees under the Communications Act.

Congress' obvious purpose in enacting the 1972 exemption was to constrain the power of the Equal Employment Opportunities Commission (EEOC) to regulate *private* religious entities. At the time the exemption was debated the civil rights statute to which it is expressly addressed applied only to private sector employers.[14] The exemption's sponsors were chiefly interested in the employ-

---

12. On affirmative action, *see* 47 C.F.R. §§ 73.125(b), 73.301(b), 73.599(b), 73.680(b), & 73.793(b). These rules are patterned on those used by the Civil Service Commission in hiring federal employees. *See* Non-Discrimination in Employment Practices, *supra* note 4, 18 FCC2d at 243. Even stronger affirmative measures apparently may be required by the Commission in particular instances. *Id.* at 244.

13. The fair employment standards in the civil rights statutes apply only to employers with 15 or more employees. 42 U.S.C. § 2000e(b).

14. The statute now covers "governments, governmental agencies, [and] political subdivisions," 42 U.S.C. § 2000e (Supp. II 1972), as well as private employers, but these public bodies were added by § 2(1) of the Equal Employment Opportunities Act of 1972, the same legislation which added the Allen-Ervin exemption for all of the "activities" of "religious" organizations. The legislative history of that exemption nowhere indicates that Congress gave any consideration to the possibility that a "religious" organization might also be a public or *quasi*-public body. The literal terms of the exemption do cover sectarian radio and television stations, but this

ment rights of wholly private educational institutions.[15] Even in their most sweeping statements the sponsors spoke of immunizing only those activities which had traditionally been free of all government regulation:

> Our amendment would strike out the word "religious" and remove religious institutions in all respects from subjugation to the EEOC.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> In other words, this amendment is to take the political hands of Caesar off of the institutions of God, where they have no place to be.[16]

As Congress is fully aware, broadcasting under the Communications Act is not an altogether private industry. Federally licensed broadcasters are "public trustees." Columbia Broadcasting System v. Democratic National Committee, 412 U.S. 94, 117, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). For decades Congress has authorized and encouraged the FCC to regulate the broadcast industry in ways which the First Amendment would clearly foreclose in the case of wholly private organs of communication. *Red Lion, supra,* 395 U.S. at 386–401. Unlike a religious newspaper, a sectarian radio or television station must, as King's Garden readily concedes, adhere to the "fairness" and "personal attack" doctrines and produce some programs of general community interest. We have no evidence that Congress wished in 1972 to upset this well established doctrine that licensed broadcasters must meet FCC-imposed obligations inapplicable to the private sector generally. King's Garden wishes us to assume that Congress now regards sectarian broadcasters as regulable "public trustees" so far as programming is concerned but as "institutions of God" untouchable by "the hands of Caesar" so far as employment practices are concerned. We would

require a sentence or two of pertinent legislative history before crediting Congress with so bizarre a notion.

### III

The question remains whether the FCC's anti-bias rules violate King's Garden's rights under the First Amendment and the Communications Act. It is to protect these rights that the Commission exempts from the ban on sectarian hiring "the employment of persons whose work is &ast; &ast; &ast; connected with the espousal of the licensee's religious views." This general policy is to be particularized on a case-by-case basis:

> [As t]here are [job] categories &ast; &ast; &ast; which may be defined differently by each licensee, we do not believe that it is advisable to issue a general declaratory ruling &ast; &ast; &ast;. We have only general information and we are dealing with an area where First Amendment rights are often involved. We believe it would be preferable, therefore, to have specific factual settings presented to us before issuing rulings. &ast; &ast; &ast; [17]

The challenge here is to the facial adequacy of the exemption. Application of the general exemption policy to a particular job position may raise additional problems, but they are not presently before us.

King's Garden argues that the FCC's exemption is so narrow as to abridge the sect's right of religious association, under the Free Exercise Clause, and its right, under the First Amendment generally, to broadcast religious views of its choice.

The premise of the first argument is that King's Garden's radio station is an integral part of the sect's "missionary" structure. From this premise King's Garden concludes that

---

is an undeliberated consequence of broad draftsmanship. It can hardly be invoked to show that Congress wished the FCC to desist from all regulation of the sectarian hiring practices of sectarian licenses.

15. *See* note 6 *supra.*

16. *Id.*

17. In Re Request of National Religious Broadcasters, Inc., *supra* note 5, 43 FCC2d at 452.

the Commission's fair employment rules tamper unconstitutionally with the sect's hierarchy, membership policy, and administration. The conclusion is based on the recognized doctrine, noted earlier, that the internal affairs of a church are immune from public regulation under the Free Exercise Clause. But the argument's premise is defective. A religious sect has no constitutional right to convert a licensed communications franchise into a church. A religious group, like any other, may buy and operate a licensed radio or television station. *See* Noe v. FCC, 104 U.S.App.D.C. 221, 260 F.2d 739 (1958), cert. denied, 359 U.S. 924, 79 S.Ct. 607, 3 L.Ed.2d 627 (1959). But, like any other group, a religious sect takes its franchise "burdened by enforceable public obligations." Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 337, 359 F.2d 994, 1003 (1966).

King's Garden relies heavily on Wisconsin v. Yoder, *supra*, which recognized that a public obligation of a seemingly neutral and secular character—*i.e.* the duty to send one's children to a secondary school—may violate the religious associational rights of particular individuals by forcing them "to perform acts undeniably at odds with fundamental tenets of their religious beliefs" so that they must "either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region." 406 U.S. at 218. The case is inapposite. Wisconsin's school attendance law intruded upon the traditional way of life of a religious sect by imposing an inescapable duty, backed by criminal penalties, on every parent of secondary school age children. By contrast, King's Garden confronts the FCC's rules only because the sect has sought out the temporary privilege of holding a broadcasting license. *See Red Lion, supra*, 395 U.S. at 386–401, *and National Broadcasting Co., supra*, 319 U.S. at 227. The FCC's rules merely condition King's Garden's ability to *extend* its activities by use of "a limited and valuable part of the public domain." *United Church of Christ, supra*, 123 U.S.App.D.C. at 337, 359 F.2d at 1003. There are, concededly, constitutional limits on the conditions which the FCC may impose. But the Constitution does not obligate the FCC to relinquish its regulatory mandate so that religious sects may merge their licensed franchises completely into their ecclesiastical structures.

King's Garden's second claim—that the FCC's exemption is too narrow to guarantee the sect's right to broadcast religious views of its choice—proceeds on somewhat firmer ground. While the constitutional dimensions of a broadcaster's speech and press rights have never been clearly delineated, the Supreme Court has recently emphasized that Congress, in enacting the Communications Act, intended licensees to have many of the liberties of private journalistic entities. *Columbia Broadcasting System, supra*, 412 U.S. at 109–111 and 124–125. Consequently, it may well be that, after it has met its "fairness doctrine" and "personal attack doctrine" obligations and produced some programs of general community interest, King's Garden has the right to give a sectarian tone or perspective to all of its other programming. This right would be infringed if the Commission, in applying its exemption, were to find no "espousal" of "religious views" in a type of programming which King's Garden considered a significant expression of its sectarian viewpoint.

But this argument is premature. It requires us to speculate that the FCC will apply the terms "espousal" and "religious views" in a cramped and dogmatic fashion. The contrary speculation is equally plausible. In applying its exemption, the Commission may well pay close and sensitive attention to the sincerely held convictions of the sectarian licensees under examination. *See* Wisconsin v. Yoder, *supra*, 406 U.S. at 209–219, *and* Fowler v. Rhode Island, 345 U.S. 67, 69, 73 S.Ct. 526, 97 L.Ed. 828 (1953). To date the Commission has done nothing more than announce that

its exemption will fix upon the nexus between the employment position in question and the religious content of the programs aired by the sectarian licensee. This is precisely the relevant nexus so far as the journalistic rights of the licensee are concerned. Where a job position has no substantial connection with program content, or where the connection is with a program having no religious dimension, enforcement of the Commission's anti-bias rules will not compromise the licensee's freedom of religious expression.

The Commission has set itself the difficult task of drawing lines between the secular and reglious aspects of the broadcasting operations of its sectarian licensees. Though this is a delicate undertaking, it is one which the First Amendment thrusts upon every public body which has dealings with religious organizations. *See Nyquist, supra,* 413 U.S. at 775; Tilton v. Richardson, 403 U.S. 672, 681, 91 S.Ct. 2091, 29 L. Ed.2d 790 (1971); Lemon v. Kurtzman, *supra,* 403 U.S. at 614. The courts have traditionally granted the FCC considerable leeway to work out the difficult First Amendment problems endemic to a system of licensed communications. *Columbia Broadcasting System, supra,* 412 U.S. at 102–103 and 132; *Red Lion, supra,* 395 U.S. at 386–401; *National Broadcasting Co., supra,* 319 U.S. at 227. As presently formulated, the Commission's religious exemption is facially adequate. Problems of application there may be, but they will be questions for another day.

Affirmed.

BAZELON, Chief Judge, concurring:

I disagree with my colleagues that the FCC can impose employment requirements in direct conflict with the standards established by Congress in Title VII. The Commission's mandate to act in the "public interest" does not empower it to contravene an explicit Congressional policy.[1] This is so, however, only if the policy in question is constitutional. I am convinced by the reasoning of part I of the court's opinion that Title VII's exemption of all "activities" of any "religious corporation, association, educational institution or society" violates the Establishment Clause of the First Amendment. Therefore, I would hold the exemption unconstitutional, and not binding on the FCC.

---

1. *See* Southern Steamship Co. v. Labor Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942).