**ARKANSAS DAY CARE ASSOCIATION, INC., et al., Plaintiffs,**

v.

**Bill CLINTON, Governor, State of Arkansas et al., Defendants.**

**No. LR C 83 192.**

United States District Court, E.D. Arkansas, W.D.

Nov. 22, 1983.

Phil Kaplan, Kaplan, Hollingsworth & Brewer, Robert M. Cearley, Cearley, Mitchell & Rochell, Little Rock, Ark., Horace Fikes, Pine Bluff, Ark., for plaintiffs.

Robert Shults, Shults & Ray, Little Rock, Ark., for defendants.

Bob Frazier, Malvern, Ark., for intervenor.

## ORDER

OVERTON, District Judge.

On February 23, 1983, the Governor of Arkansas signed into law Act 245 of 1983, entitled, "An Act to Provide for Religious Exemptions for Religious Child Care Facilities that are now required to be Licensed Under the Child Care Facility Licensing Act; to Provide Procedures by which Religious Child Care Facilities May be Exempt From the Child Care Facility Licensing and for Other Purposes." The complaint, filed March 4, 1983, under 42 U.S.C. § 1983, challenges the constitutional validity of Act 245 and its predecessors, Act 518 of 1981 and Act 123 of 1973 on three grounds.

First, plaintiffs contend the Acts constitute an establishment of religion prohibited by the First Amendment to the Constitution which is made applicable to the states by the Fourteenth Amendment. Second, they argue the Acts are impermissibly vague and violate the Due Process Clause of the Fourteenth Amendment. Third, they allege the Acts discriminate against nonexempt child care facilities in violation of the Equal Protection Clause of the Fourteenth Amendment.

The plaintiffs include Arkansas Day Care Association, Inc., a nonprofit corporation of proprietary day care providers; Betty Caldwell, president of the National Association for the Education of Young People; and Mike and Karen Welch and Timothy and Vicki Martin, parents and next friends of minor children who attended unlicensed day care centers.

The defendants include Governor Bill Clinton, the Arkansas Child Care Facility Review Board and its members.

The Texarkana Baptist Orphanage, a religious child care facility exempt under Act 518 of 1981, was allowed to intervene on August 1, 1983.

All parties moved for summary judgment. An evidentiary hearing was scheduled for August 11, 1983, but the parties elected to stand on the record. The case is ripe for adjudication.

### Legislative History

A. *Act 434 of 1969.*

In 1969, the Arkansas Legislature enacted the Child Care Facility Licensing Act, codified as Ark.Stat.Ann. § 83–901 et seq. (Repl.1981), which established a system for licensing and regulating "child care facilities" as that term is defined in § 83–902(D). Although the Act initially authorized the Welfare Department to promulgate "rules and regulations setting minimum standards governing the granting, revocation, refusal, and suspension of licenses for a child care facility and the operation of a child care facility," the Act was amended in 1973 to transfer this rule making authority to the Child Care Facility Review Board [the "Board"]. Ark.Stat.Ann. § 83–911 (Repl. 1981). The Social Services Division of the Department of Human Services [the "Social Services Division"] continued to be the agency charged with responsibility for administering the law. *Id.*

The 1969 Act explicitly provided that the Board shall adopt such rules and regulations as will:

"... promote the health, safety and welfare of children attending a Child Care Facility, promote safe, comfortable and healthy physical facilities for the children who attend the Child Care Facility; insure adequate supervision of the children by capable, qualified and healthy individuals; insure appropriate educational programs and activities within each Child Care Facility; and insure adequate and healthy food services where food service is offered by the Child Care Facility."

Ark.Stat.Ann. § 83–904(B) (Repl.1981). Consistent with this broad policy objective, the Board promulgated and published rules and regulations governing the "minimum licensing requirements" for four separate categories of child care facilities: Day Care Centers; Infants and Toddlers in Day Care

Centers; Residential Child Care Facilities; and Day Care Family Homes.

The 1969 Act did not contain an exemption for religious child care facilities. Rather, any "person, partnership, corporation, group or association desiring to operate a child care facility" was required to apply for a license from the State. Ark. Stat.Ann. § 83–905 (Repl.1981). Following a review of the application by the Social Services Division or other appropriate State agency to insure that the applying facility met the legal requirements, the applicant was issued a license. Ark.Stat.Ann. § 83–908 (Repl.1981).

B. *Act 123 of 1973.*

In 1973, the legislature adopted Act 123, codified as Ark.Stat.Ann. § 83–918 (Repl. 1981), which amended the 1969 Act to include an exemption from the licensing requirement for religious child care facilities organized and operating as of July 1, 1969. The express legislative purpose for creating this exemption was to accommodate religious child care facilities in the free exercise of religious beliefs by allowing exemption from licensing where "conformity with said licensing standards violates basic religious tenament [tenets] of the church as it relates to separation of church and state ..." Ark.Stat.Ann. § 83–918 (Repl.1981). Under this statute, a religious child care facility could apply for an exemption by having the "governing body" of the religious child care facility submit a letter to the Board which:

(1) Requests that the facility be exempt from "licensing standards because conformity with said licensing standards violates basic religious tenament [tenets] of the church as it relates to separation of church and state;"

(2) Certifies that the facility "has met fire, safety and health standards of either state or local fire, safety and health inspections;" and

(3) Certifies that the facility is "in substantial compliance with the published standards under which similar nonreligious facilities are required by the state to operate."

The statute also provided that within one year after the receipt of a properly executed request for exemption, the Social Services Division was authorized to inspect each exempt facility to determine: (1) "whether the premises and care being received by the children therein, and other matters affecting the safety and health of such children, are being provided in accordance with the recognized health and safety standards within the community;" and (2) "whether the institution is in fact in substantial compliance with the rules promulgated for similar [nonexempt] institutions." If this inspection revealed any evidence of a violation of these standards, including any evidence of child abuse, the Social Services Division, with the consent of the Board, was authorized to bring an action for injunctive relief. Ark.Stat.Ann. § 83–918 (Repl.1981).

In order to discharge its administrative responsibilities under the statutes, the Social Services Division adopted various rules published as part of its "Services Programs Policy Manual" [the "Manual"]. Section 9140 of the Manual set forth the role of the Division in monitoring exempt facilities:

"If the Review Board grants an exemption, a designated Child Care Specialist will inspect the facility within a period of one year. The Child Care Specialist will apply the process of determining whether or not the facility is in substantial compliance with rules promulgated for similar facilities. The process of determining substantial compliance will then be continued in intervals of one year, with final approval of these yearly determinations to be issued by the Review Board."

C. *Act 518 of 1981.*

In 1981 the legislature passed Act 518, revising the 1973 religious child care facility exemption. Ark.Stat.Ann. § 83–918 (Supp.1983). The compiler's notes indicate that this statute repealed by substitution

the earlier religious child care facility exemption created by Act 123 of 1973.[1]

Act 518 set forth the same general legislative purpose expressed in the original exemption—to accommodate religious child care facilities. The preamble stated:

"It is hereby found and determined by the General Assembly that the principle of separation of church and state is fundamental to the constitutional rights of the people of this Country, and that religious organizations should be encouraged to operate religious child care facilities without undue harassment or interference in the operation of such facilities, provided that, local health, fire and safety officials have inspected the facility with respect to safety and health safeguards and have found the same to be substantially in compliance with the standards promulgated for similar institutions within the community, and that the immediate passage of this Act is essential· to guarantee and to preserve the rights of such facilities under the religious freedom safeguards of this Country."

Under the terms of Act 518, the procedure for obtaining a religious exemption was modified:

(1) After requesting an exemption on the grounds that the licensing standards violate the basic religious tenets of the church "as they relate to separation of church and state", the governing board of the facility was required to certify annually that the institution meets local fire, safety and health standards.

(2) The facility must certify annually that it is in "substantial compliance with the published standards under which similar nonreligious facilities are required by the state to operate."

The most significant change, however, *prohibited* State inspection of the exempt religious facilities except in cases of alleged or suspected child abuse.

### D. *Act 245 of 1983.*

The 1983 General Assembly again considered exemptions for religious child care facilities. House Bill 54 (HB 54), the first legislative proposal, sought to exempt religious child care facilities from virtually all State regulation. The proposal drew immediate criticism from many sources, including various church leaders and the Arkansas Attorney General.

Thereafter, Senate Bill 96 (SB 96) was introduced as an alternative. Under SB 96, exempt and nonexempt facilities were required to meet the same regulatory standards, except exempt facilities were not required to obtain a license. House Bill 223 (HB 223), introduced as a counterpart to SB 96, similarly provided an exemption for religious child care facilities.

On January 24, 1983, at a meeting of the Committee on State Agencies and Governmental Affairs, an ad hoc citizens committee was formed to propose compromise legislation. The committee used HB 223 as the working draft and HB 54 was abandoned. During the drafting process, the ad hoc committee consulted with the Attorney General and other attorneys. After several meetings, the ad hoc committee submitted its revised draft of HB 223 to the Committee on State Agencies and Governmental Affairs. The revised draft was enacted without change as Act 245 of 1983.

The legislative purpose, stated in the preamble, was to extend the religious exemption to facilities organized after July 1, 1969.

Act 245, codified as Ark.Stat.Ann. §§ 83–920—924 (Supp.1983), provides that any church, defined by the state income tax code, operating a child care facility, is exempt from obtaining a license. To qualify, a facility must certify that it has passed fire, safety and health inspections and is in substantial compliance with the published standards for nonexempt facilities. The Board may "visit and review" the facilities

---

1. Although plaintiffs challenge the constitutionality of Act 123 of 1973, the Court is of the opinion that the portions of that Act relevant to this lawsuit were effectively repealed by Act 518 of 1981. *See also, infra,* note 16.

to verify substantial compliance.[2] With respect to exempt facilities, Act 245 provides that "standards for substantial compliance shall not include those of a religious or curriculum nature so long as the health, safety and welfare of the child is [are] not endangered."

In addition, § 83–923 specifically amended the earlier Acts to correct a discrepancy. The section provides that all facilities, exempt and nonexempt, are held to the standard of "substantial compliance" with the rules and regulations of the Board.[3] Perhaps the most significant section of Act 245, insofar as this inquiry is concerned, is Section 5, codified as Ark. Stat.Ann. § 83–924 (Supp.1983). That section provides that the statutes are cumulative and Act 245 "shall not modify or repeal any of the provisions of Act 518 of 1981 [§§ 83–908, 83–918, 83–919]".[4]

*Cumulative Effect of the Acts*

This milieu of piecemeal legislation has produced a somewhat confusing and inconsistent statutory scheme which was not, perhaps, the intended result. Nevertheless, the Court construes the cumulative effect of the various enactments as follows: [5]

A. *Nonexempt Child Care Facilities.*

Nonexempt facilities must submit a written license application. If the applicant

meets the statutory and administrative requirements,[6] a license shall be granted for one year unless revoked. Ark.Stat.Ann. § 83–905 (Repl.1981). The Board may inspect the facility to determine if it is operating in accordance with the law. Ark. Stat.Ann. § 83–908 (Supp.1983).

B. *Exempt Facilities Organized on or before July 1, 1969.*

Any "religious child care facility"[7] organized and operating as of July 1, 1969, may seek an exemption from the standards[8] of the Board and the provisions of Ark.Stat.Ann. §§ 83–908, 918, 919 (Supp. 1983). In order to do so, the facility must certify in writing that (1) "conformity with said licensing standards violates the basic religious tenets of the church as they relate to separation of church and state"; (2) the institution has met the fire, safety and health standards of local fire, safety and health inspections; and (3) it is in substantial compliance with the published standards for "nonreligious facilities".[9] The Board is specifically prohibited from inspecting any religious child care facility after it certifies compliance, except in cases of alleged or suspected child abuse. Ark. Stat.Ann. § 83–918 (Supp.1983).

C. *Exempt Facilities Organized After July 1, 1969.*

---

**2.** Since passage of Act 245, the Board adopted a regulation providing for inspection of exempt facilities. The inspection process is the same for all facilities. *See* defendants' Exhibit 1.

**3.** Before Act 245, nonexempt facilities were required to fully comply with "minimum standards" of the rules and regulations of the Board while exempt facilities were required to certify only "substantial compliance" with the rules and regulations.

**4.** This section is of added importance since the Arkansas courts do not favor the doctrine of "repeal by implication". *Mears v. Arkansas State Hospital,* 265 Ark. 844, 581 S.W.2d 339 (1979); *Davis v. Cox,* 268 Ark. 78, 593 S.W.2d 180 (1980). The Arkansas courts will not conclude a statute has been repealed by implication unless a legislative intention to repeal or supersede the statute plainly and clearly appears. The implication must be clear, necessary and

irresistible. *Davis, supra; McDonald v. Wasson,* 188 Ark. 782, 67 S.W.2d 722 (1934).

**5.** There are, of course, many provisions in the statutes, but this discussion is limited to the relevant portions.

**6.** "Substantial compliance" only is required. *See* Ark.Stat.Ann. § 83–923 (Supp.1983); *supra,* note 3.

**7.** "Religious child care facility" is not defined.

**8.** Presumably the rules and regulations.

**9.** The use of the term "nonreligious facilities" as an attempt to describe nonexempt facilities is puzzling. Many facilities operated by churches are licensed and operate in accordance with the rules and regulations applicable to nonexempt facilities.

Any church or group of churches [10] operating a child care facility may obtain an exemption from the licensing requirement by certifying that the facility (1) has met fire, safety and health inspections, and (2) is in substantial compliance with the standards applicable to nonexempt facilities. The facilities are subject to "visit and review" by the Board for verification of substantial compliance. An exception to compliance exists for those standards of "a religious or curriculum nature".

### D. Comparison of Religious Exemptions.

There are a number of significant differences in the manner in which the legislature has treated the exemptions for child care facilities organized *as of* July 1, 1969, and those organized *after* July 1, 1969. First, Act 518 of 1981 applies to "any religious child care facility" organized as of July 1, 1969. Act 245 of 1983, which applies to facilities organized after July 1, 1969, grants exemptions to "any church or group of churches, exempt from the state income tax levied by Act 118 of 1929, as amended". Second, facilities organized as of July 1, 1969, must certify that conformity with the licensing standards "violates the basic religious tenets of the church as they relate to separation of church and state". No such requirement is imposed by the 1983 Act upon facilities organized after July 1, 1969. Third, facilities under the 1981 Act are exempt "from the child care institution standards promulgated by the Child Care Facility Review Board ... and ... the provisions of this Act." Facilities under the 1983 Act are merely exempt from "obtaining a license" and complying with standards "of a religious or curriculum nature." Finally, the 1981 Act prohibits inspection of exempt facilities organized as of July 1, 1969. The 1983 Act authorizes inspection of exempt facilities organized after July 1, 1969.

### Legal Analysis

The attack upon the constitutionality of the religious exemptions and the defense of

the various Acts rests upon oft-recited language from familiar case citations. The opponents of the exemptions claim the Acts clearly violate the three tests set out in such cases as *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam) and are, therefore, an "establishment of religion" in violation of the First Amendment. The defendants argue that the exemptions are permissible accommodations which preserve the State's only legitimate concern—the health, safety and welfare of the children. Attention is directed to cases such as *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), and *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), where legislation generally beneficial to religion was upheld.

In this case, the State purportedly accommodates religious beliefs of certain churches that State regulation of practices which they consider part of their ministry violates their religious tenets. As explained at oral argument, churches supporting the legislation consider the operation of child care facilities a part of their ministry. The requirement that the church obtain a license to operate a day care center, for example, is viewed in the same fashion as a requirement that the church obtain a license to conduct a church service. The idea is that allegiance in the ministry is owed to God, and not the State.

Although the witnesses had difficulty articulating the nature of the religious belief and the extent of its application, the Arkansas Legislature recognized the belief as legitimate and sincere. No evidence was presented in Court to the contrary. Indeed, when it comes to the legitimacy of religious beliefs or the sincerity of those who espouse those beliefs, courts should be wary of questioning that which is not readily understood. *Thomas v. Review Bd. of Indiana, Empl. Sec. Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1980).

10. As defined by Act 118 of 1929, as amended.

A traditional analysis of the claimed Establishment Clause violation using only the tests of *Lemon v. Kurtzman, supra,* does not provide a complete or satisfactory answer to the issues in this case. The First Amendment contains not one, but two limitations on the powers of government concerning matters of religion. While governments are prohibited from making any law "respecting an establishment of religion", they are, likewise, prevented from "prohibiting the free exercise thereof." The usual application of *Lemon* fails to recognize the State's interest in preserving the free exercise of religious freedoms.

Courts have often stated that there is a "wall" between the government and religion. *See Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1878) (quoting Thomas Jefferson). The Supreme Court has said that the wall "must be kept high and impregnable". *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947). However, it also has noted that the Free Exercise Clause and Establishment Clause overlap and that maintenance of neutrality is difficult. *Abington School Dist. v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963).

> The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme would tend to clash with the other ...
>
> The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist

without sponsorship and without interference.

> Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice.
>
> Adherents of particular faiths and individual churches frequently take strong positions on public issues including, as this case reveals in the several briefs *amici,* vigorous advocacy of legal or constitutional positions. Of course, churches as much as secular bodies and private citizens have that right. No perfect or absolute separation is really possible; the very existence of the Religion Clauses is an involvement of sorts—one that seeks to mark boundaries of excessive entanglement.

*Walz v. Tax Commission,* 397 U.S. at 668–70, 90 S.Ct. at 1411–12 (1970).

 Religion and secular governmental regulation must coexist. Between the twin boundaries of the religion clauses lies a zone of permissible state regulation. The zone extends from a point delineated on one side by *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), where the State's interests are insufficient to justify the burden on religion, to a point on the other side delineated by *Lemon,* where the State has "accommodated" religion to the point of establishment. The width of the zone varies with the weight of the State's interests balanced against the affected religious beliefs. While regulating in this zone, the State may make legitimate accommodations of religious beliefs. *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). If the State does not regulate because it recognizes a religious belief, then it accommo-

dates that belief. Thus, regulation and accommodation may vary inversely. Under-regulation may result in an over-accommodation and vice versa. In drawing the line between regulation and accommodation, the State must be particularly careful to recognize its role of neutrality.

■ When the line between regulation and accommodation distinguishes religious and nonreligious groups, as in *King's Garden, Inc. v. F.C.C.*, 498 F.2d 51 (D.C.Cir. 1974), *cert. den.*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974), or makes denominational preferences, as in *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the State's decision is subject to strict scrutiny and the placement of the line must be "closely fitted" to a compelling state interest.[11]

Although the plaintiffs argue all the Acts suffer the same constitutional infirmities and make no distinction between Act 245 of 1983 and Act 518 of 1981, the two are significantly different and warrant individual scrutiny.

### Act 245 of 1983

■ Within this framework, the Court will test the most recent legislative enactment, Act 245 of 1983. The only substantive "accommodations" made to church operated child care facilities are: (1) the exemption from formal licensing; and (2) exemption from compliance with standards of a "religious or curriculum nature so long as the health, safety and welfare of the child is [are] not endangered." Ark.Stat. Ann. §§ 83–920, 921 (Supp.1983). In all other respects, exempt facilities under Act 245 are treated the same as nonexempt facilities.

The exemption from the formality of obtaining a license is a reasonable accommodation to the religious beliefs recognized by the legislature. The State's interest in the welfare of children is served despite the lack of the State's formal imprimatur on the church's ministerial practice. The facility must still certify substantial compliance with the law and the Board may verify compliance through inspection.

Plaintiffs argue that nonexempt facilities are in some manner disadvantaged because they must pass inspection by the Board before a license is issued, while exempt facilities are merely required to file a certification of substantial compliance. Since the legislative acts are under attack, and not the rules, regulations and practices of the Board, it is noteworthy that § 83–905 carries no mandate that nonexempt facilities pass inspection before a license is issued. In any event, there is no persuasive evidence that the exemption provides any significant or substantial advantage, economic or otherwise.

The provision of Act 245 that standards for substantial compliance shall not include those of a "religious or curriculum nature", is also an acceptable accommodation by the State. The State's interest in regulating the course of study is minimal, as demonstrated by the paucity of rules promulgated by the Board[12]. The State has no legitimate interest in regulating matters of religion. As we know, some parents send their children to sectarian schools for the religious instruction and moral training. Where the State's demonstrated interest in the course of study is insubstantial, as here, there is no constitutional prohibition against providing an exemption from compliance. Furthermore, there is no evidence that the exemption will significantly impair fulfillment of any state interest.

The principal argument advanced by plaintiffs is that the exemptions are an "establishment of religion". They claim Act 245 lacks secular purpose, the first test enunciated in *Lemon v. Kurtzman, supra*,

---

**11.** The First Amendment test and the Equal Protection "strict scrutiny" test appear the same in light of *Larson v. Valente, supra*. *Larson* is clearly a First Amendment case and the test used fits comfortably with the issues in this lawsuit. Thus, the issues focus upon application of the "strict scrutiny" test with defendants bearing the burden of proof.

**12.** *See* Exhibits A, B, C and D attached to defendants' motion for summary judgment. The bulk of rules and regulations relate to concerns of health, safety and welfare and not matters of educational content.

and that it has no purpose other than favoring religious fundamentalism. The point is made that Arkansas has a history of legislation favorable to "religious fundamentalists". Legislation which has the primary effect of advancing religious beliefs is prohibited by the second test spelled out in *Lemon.*

A secular purpose is fulfilled by Act 245 because its provisions encourage operation of church sponsored facilities. The State has an obvious interest, for example, in encouraging the establishment of day care centers which provide safe and wholesome environments. Insofar as Act 245 encourages involvement of church organizations in such ventures which they might have otherwise avoided, the Act accomplishes its secular purpose. The Act 245 exemptions do not "advance" religion. At most, the provisions of the Act passively involve religion in areas of minimal State interest.

The fact that Act 245 was passed in response to lobbying efforts of "religious fundamentalists" is not persuasive evidence that it is constitutionally defective. Obviously, the proponents of Act 245 were motivated by their religious views, but there is no vice in that. *Walz v. Tax Commission, supra.* The evidence of legislative history in this case does not establish the persistent course of state support for particular religious views which existed in such cases as *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) and *McLean v. State Bd. of Education,* 529 F.Supp. 1255 (E.D.Ark.1982).

■ Plaintiffs argue the exemptions of the Acts are overbroad. It is urged that an exemption available to all "churches or groups of churches" is unnecessary because the licensing requirement does not offend the religious beliefs of all religious organizations which sponsor child care facilities. Perhaps the definition of religious organizations to which the exemption applies could have been more narrowly defined. A more precise definition might, however, involve interpretation questions

of religious beliefs and tend to foster excessive entanglement problems. The dangers of "wholesale" exemptions condemned in *King's Garden v. F.C.C., supra,* are not present in Act 245. There is no reason to believe the exemption will be sought by churches whose religious beliefs are not offended by the licensing requirement since it offers no practical advantage.

The benefit of the exemption is a matter of form, not substance. Further, the exemption is reasonably related to the religious belief accommodated and "closely fitted" to a compelling state interest, i.e., encouraging the operation of child care facilities with safe and wholesome environments.

The Court concludes that the exemption of Act 245 of 1983 contained in Sections 1 and 2 is a permissible accommodation to religious beliefs and the exemption does not constitute the "establishment of religion" under the *Lemon* test or otherwise violate the First or Fourteenth Amendments. The "vagueness" argument advanced by plaintiffs is not aimed at the definitions in Act 245.

### Act 518 of 1981

■ Presumably, the legislature recognized the religious beliefs relating to separation of church and state and accommodated them to the extent necessary and appropriate in Act 245. While the exemptions granted in Act 245 are justified, the same cannot be said about Act 518 of 1981 [Ark.Stat.Ann. § 83–918]. The defendants have advanced no neutral secular purpose for the disparate treatment accorded facilities organized before or after the arbitrary date of July 1, 1969.

As previously noted, exempt facilities under Act 518 are not merely exempt from licensing, but are also exempt from meeting Board standards.[13] A facility must simply certify compliance with the "fire, safety and health standards of *local* fire, safety, and health inspection", and "substantial compliance with the published stan-

---

13. Exempt facilities were held to a substantial compliance standard rather than full compli-

ance. *See supra,* note 3.

dards under which similar nonreligious facilities are required by the State to operate".[14] More importantly, the State is prohibited from inspecting the facilities to monitor compliance.

Defendants argue that Act 518 requires compliance with "local" fire, safety, and health standards[15], requires substantial compliance with Board standards and allows inspection in cases of alleged or suspected child abuse. They also claim the child's welfare is adequately protected and the State is free to grant the exemptions it chooses.

The Court does not agree that the State's announced interests are adequately protected by Act 518. The Board's rules and regulations apply to the entire child care operation, ranging from staffing requirements to nutrition requirements. Apparently the legislature believed the Board should have authority to inspect nonexempt facilities and those exempt facilities under Act 245. The State has an obvious interest in inspection by qualified personnel.

The defendants have made no attempt to explain why inspection is prohibited of exempt facilities under Act 518 which certify substantial compliance, while inspection is authorized of all nonexempt facilities and exempt facilities under Act 245. Furthermore, the defendants have made no attempt to explain any rational relationship between the date of July 1, 1969, and any religious belief of "separation of church and state" which the Acts purport to accommodate.

Since the State has made an over-accommodation of certain religious child care facilities but the defendants failed to meet their burden of showing that the accommodations were "closely fitted" to the State interest under the light of strict scrutiny, the Court concludes that the sweeping exemptions for religious facilities granted by Act 518 of 1981 are constitutionally infirm.[16]

It is the opinion of this Court that Act 245 of 1983 (except Section 5, codified as Ark.Stat.Ann. § 83–924 (Supp.1983)—the section which preserves Act 518 of 1981) is constitutional and that Act 518 of 1981 is unconstitutional.

Judgment will be entered in accordance with this decision.

---

14. The exemptions of Act 518 are available to "any *religious* child care facility". Plaintiffs allege the Act is void for vagueness since there is no definition of "religious child care facility". There is no reason to reach this argument.

15. No explanation is advanced why exempt facilities organized as of July 1, 1969, are required to certify compliance with *local* standards. "Local" is omitted from Act 245 of 1983, which provides exemptions for facilities organized after July 1, 1969.

16. Furthermore, even if "strict scrutiny" were not applied, the distinction between child care facilities operating on July 1, 1969, and those which began operation on July 2, 1969, and after cannot withstand even minimal scrutiny under traditional Due Process and Equal Protection analysis. *See U.S. v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (Due Process); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911) (Equal Protection). This Court cannot conceive any state of facts which might reasonably support this distinction. It is arbitrary. Act 123 of 1973, repealed by Act 518 of 1981, had similar problems.