MEMORANDUM OPINION
 

 OVERTON, District Judge.
 

 Introduction
 

 On March 19, 1981, the Governor of Arkansas signed into law. Act 590 of 1981, entitled the “Balanced Treatment for Creation-Science and Evolution-Science Act.” The Act is codified as Ark.Stat.Ann. § 80-1663,
 
 et seq.
 
 (1981 Supp.). Its essential mandate is stated in its first sentence: “Public schools within this State shall give balanced treatment to creation-science and to evolution-science.” On May 27, 1981, this suit was filed
 
 [1]
 
 challenging the consti
 
 *1251
 
 tutional validity of Act 590 on three distinct grounds.
 

 First, it is contended that Act 590 constitutes an establishment of religion prohibited by the First Amendment to the Constitution, which is made applicable to the states by the Fourteenth Amendment. Second, the plaintiffs argue the Act violates a right to academic freedom which they say is guaranteed to students and teachers by the Free Speech Clause of the First Amendment. Third, plaintiffs allege the Act is impermissibly vague and thereby violates the Due- Process Clause of the Fourteenth Amendment.
 

 The individual plaintiffs include the resident Arkansas Bishops of the United Methodist, Episcopal, Roman Catholic and African Methodist Episcopal Churches, the principal official of the Presbyterian Churches in Arkansas, other United Methodist, Southern Baptist and Presbyterian clergy, as well as several persons who sue as parents and next friends of minor children attending Arkansas public schools. One plaintiff is a high school biology teacher. All are also Arkansas taxpayers. Among the organizational plaintiffs are the American Jewish Congress, the Union of American Hebrew Congregations, the American Jewish Committee, the Arkansas Education Association, the National Association of Biology Teachers and the National Coalition for Public Education and Religious Liberty, all of which sue on behalf of members living in Arkansas.
 
 [2]
 

 The defendants include the Arkansas Board of Education and its members, the Director of the Department of Education, and the State Textbooks and Instructional Materials Selecting Committee.
 
 [3]
 
 The Pulaski County Special School District and its Directors and Superintendent were voluntarily dismissed by the plaintiffs at the pre-trial conference held October 1, 1981.
 

 The trial commenced December 7, 1981, and continued through December 17, 1981. This Memorandum Opinion constitutes the Court’s findings of fact and conclusions of law. Further orders and judgment will be in conformity with this opinion.
 

 I.
 

 There is no controversy over the legal standards under which the Establishment Clause portion of this case must be judged. The Supreme Court has on a number of occasions expounded on the meaning of the clause, and the pronouncements are clear. Often the issue has arisen in the context of public education, as it has here. In
 
 Everson v. Board of Education,
 
 330 U.S. 1,15-16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), Justice Black stated:
 

 “The ‘establishment of religion’ clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church-attendance or non-attendance. No tax, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and
 
 vice versa,
 
 In the words of Jefferson, the clause . . .
 
 *1252
 
 was intended to erect ‘a wall of separation between church and State.’ ”
 

 The Establishment Clause thus enshrines two central values: voluntarism and pluralism. And it is in the area of the public schools that these values must be guarded most vigilantly.
 

 “Designed to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people, the public school must keep scrupulously free from entanglement in the strife of sects. The preservation of the community from divisive conflicts, of Government from irreconcilable pressures by religious groups, of religion from censorship and coercion however subtly exercised, requires strict confinement of the State to instruction other than religious, leaving to the individual’s church and home, indoctrination in the faith of his choice.”
 

 McCollum v. Board of Education,
 
 333 U.S. 203, 216-217, 68 S.Ct. 461, 468, 92 L.Ed. 649 (1948), (Opinion of Frankfurter, J., joined by Jackson, Burton and Rutledge, JJ.).
 

 The specific formulation of the establishment prohibition has been refined over the years, but its meaning has not varied from the principles articulated by Justice Black in
 
 Everson.
 
 In
 
 Abington School District v. Schempp,
 
 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963), Justice Clark stated that “to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.” The Court found it quite clear that the First Amendment does not permit a state to require the daily reading of the Bible in public schools, for “[sjurely the place of the Bible as an instrument of religion cannot be gainsaid.”
 
 Id.
 
 at 224, 83 S.Ct. at 1572. Similarly, in
 
 Engel v. Vitale,
 
 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Court held that the First Amendment prohibited the New York Board of Regents from requiring the daily recitation of a certain prayer in the schools. With characteristic succinctness, Justice Black wrote, “Under [the First] Amendment’s prohibition against governmental establishment of religion, as reinforced by the provisions of the Fourteenth Amendment, government in this country, be it state or federal, is without power to prescribe by law any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.”
 
 Id.
 
 at 430, 82 S.Ct. at 1266. Black also identified the objective at which the Establishment Clause was aimed: “Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion.”
 
 Id.
 
 at 431, 82 S.Ct. at 1267.
 

 Most recently, the Supreme Court has held that the clause prohibits a state from requiring the posting of the Ten Commandments in public school classrooms for the same reasons that officially imposed daily Bible reading is prohibited.
 
 Stone v. Graham,
 
 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). The opinion in
 
 Stone
 
 relies on the most recent formulation of the Establishment Clause test, that of
 
 Lemon v. Kurtzman,
 
 403 U.S. 602, 612-613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971):
 

 “First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster ‘an excessive government entanglement with religion.’ ”
 

 Stone v. Graham,
 
 449 U.S. at 40, 101 S.Ct. at 193.
 

 It is under this three part test that the evidence in this case must be judged. Failure on any of these grounds is fatal to the enactment.
 

 II.
 

 The religious movement known as Fundamentalism began in nineteenth century America as part of evangelical Protestantism’s response to social changes, new religious thought and Darwinism. Fundamentalists viewed these developments as attacks on the Bible and as responsible for a decline in traditional values.
 

 
 *1253
 
 The various manifestations of Fundamentalism have had a number of common characteristics,
 
 [4]
 
 but a central premise has always been a literal interpretation of the Bible and a belief in the inerrancy of the Scriptures. Following World War I, there was again a perceived decline in traditional morality, and Fundamentalism focused on evolution as responsible for the decline. One aspect of their efforts, particularly in the South, was the promotion of statutes prohibiting the teaching of evolution in public schools. In Arkansas, this resulted in the adoption of Initiated Act 1 of 1929.
 
 [5]
 

 Between the 1920’s and early 1960’s, anti-evolutionary sentiment had a subtle but pervasive influence on the teaching of biology in public schools. Generally, textbooks avoided the topic of evolution and did not mention the name of Darwin. Following the launch of the Sputnik satellite by the Soviet Union in 1957, the National Science Foundation funded several programs designed to modernize the teaching of science in the nation’s schools. The Biological Sciences Curriculum Study (BSCS), a nonprofit organization, was among those receiving grants for curriculum study and revision. Working with scientists and teachers, BSCS developed a series of biology texts which, although emphasizing different aspects of biology, incorporated the theory of evolution as a major theme. The success of the BSCS effort is shown by the fact that fifty percent of American school children currently use BSCS books directly and the curriculum'is incorporated indirectly in virtually all biology texts. (Testimony of Mayer; Nelkin, Px 1)
 
 [6]
 

 In the early 1960’s, there was again a resurgence of concern among Fundamentalists about the loss of traditional values and a fear of growing secularism in society. The Fundamentalist movement became more active and has steadily grown in numbers and political influence. There is an emphasis among current Fundamentalists on the literal interpretation of the Bible and the Book of Genesis as the sole source of knowledge about origins.
 

 The term “scientific creationism” first gained currency around 1965 following publication of
 
 The Genesis Flood
 
 in 1961 by Whitcomb and Morris. There is undoubtedly some connection between the appearance of the BSCS texts emphasizing evolutionary thought and efforts by Fundamentalists to attack the theory. (Mayer)
 

 In the 1960’s and early 1970’s, several Fundamentalist organizations were formed to promote the idea that the Book of Genesis was supported by scientific data. The terms “creation science” and “scientific creationism” have been adopted by these Fundamentalists as descriptive of their study of creation and the origins of man. Perhaps the leading creationist organization is the Institute for Creation Research (ICR), which is affiliated with the Christian Heritage College and supported by the Scott Memorial Baptist Church in San Diego, California. The ICR, through the Creation-Life Publishing Company, is the leading publisher of creation science material. Other creation science organizations include the Creation Science Research Center (CSRC) of San Diego and the Bible Science Association of Minneapolis, Minnesota. In 1963, the Creation Research Society (CRS) was
 
 *1254
 
 formed from a schism in the American Scientific Affiliation (ASA). It is an organization of literal Fundamentalists
 
 [7]
 
 who have the equivalent of a master’s degree in some recognized area of science. A purpose of the organization is “to reach all people with the vital message of the scientific and historic truth about creation.” Nelkin,
 
 The Science Textbook Controversies and the Politics of Equal Time,
 
 66. Similarly, the CSRC was formed in 1970 from a split in the CRS. Its aim has been “to reach the 63 million children of the United States with the scientific teaching of Biblical creationism.”
 
 Id.
 
 at 69.
 

 Among creationist writers who are recognized as authorities in the field by other creationists are Henry M. Morris, Duane Gish, G. E. Parker, Harold S. Slusher, Richard B. Bliss, John W. Moore, Martin E. Clark, W. L. Wysong, Robert E. Kofahl and Kelly L. Segraves. Morris is Director of ICR, Gish is Associate Director and Se-graves is associated with CSRC.
 

 Creationists view evolution as a source of society’s ills, and the writings of Morris and Clark are typical expressions of that view.
 

 “Evolution is thus not only anti-Biblical and anti-Christian, .but it is utterly unscientific and impossible as well. But it has served effectively as the pseudo-scientific basis of atheism, agnosticism, socialism, fascism, and numerous other false and dangerous philosophies over the past century.”
 

 Morris and Clark,
 
 The Bible Has The Answer,
 
 (Px 31 and Pretrial Px 89).
 
 [8]
 

 Creationists have adopted the view of Fundamentalists generally that there are only two positions with respect to the origins of the earth and life: belief in the inerrancy of the Genesis story of creation and of a worldwide flood as fact, or belief in what they call evolution.
 

 Henry Morris has stated, “It is impossible to devise a legitimate means of harmonizing the Bible with evolution.” Morris, “Evolution and the Bible,”
 
 ICR Impact Series
 
 Number 5 (undated, unpaged), quoted in Mayer, Px 8, at 3. This dualistic approach to the subject of origins permeates the creationist literature.
 

 The creationist organizations consider the introduction of creation science into the public schools part of their ministry. The ICR has published at least two pamphlets
 
 [9]
 
 containing suggested methods for convincing school boards, administrators and teachers that creationism should be taught in public schools. The ICR has urged its proponents to encourage school officials to voluntarily add creationism to the curriculum.
 
 [10]
 

 
 *1255
 
 Citizens For Fairness In Education is an organization based in Anderson, South Carolina, formed by Paul Ellwanger, a respiratory therapist who is trained in neither law nor science. Mr. Ellwanger is of the opinion that evolution is the forerunner of many social ills, including Nazism, racism and abortion. (Ellwanger Depo. at 32-34). About 1977, Ellwanger collected several proposed legislative acts with the idea of preparing a model state act requiring the teaching of creationism as science in opposition to evolution. One of the proposals he collected was prepared by Wendell Bird, who is now a staff attorney for ICR.
 
 [11]
 
 From these various proposals, Ellwanger prepared a “model act” which calls for “balanced treatment” of “scientific creationism” and “evolution” in public schools. He circulated the proposed act to various people and organizations around the country.
 

 Mr. Ellwanger’s views on the nature of creation science are entitled to some weight since he personally drafted the model act which became Act 590. His evidentiary deposition with exhibits and unnumbered attachments (produced in response to a subpoena
 
 duces tecum)
 
 speaks to both the intent of the Act and the scientific merits of creation science. Mr. Ellwanger does not believe creation science is a science. In a letter to Pastor Robert E. Hays he states, “While neither evolution nor creation can qualify as a scientific theory, and since it is virtually impossible at this point to educate the whole world that evolution is not a true scientific theory, we have freely used these terms — the evolution theory and the theory of scientific creationism — in the bill’s text.” (Unnumbered attachment to Ellwanger Depo., at 2.) He further states in a letter to Mr. Tom Bethell, “As we examine evolution (remember, we’re not making any scientific claims for creation, but we are challenging evolution’s claim to be scientific) ...” (Unnumbered attachment to Ellwanger Depo. at 1.)
 

 Ellwanger’s correspondence on the subject shows an awareness that Act 590 is a religious crusade, coupled with a desire to conceal this fact. In a letter to State Senator Bill Keith of Louisiana, he says, “I view this whole battle as one between God and anti-God forces, though I know there are a large number of evolutionists who believe in God.” And further, “.. . it behooves Satan to do all he can to thwart our efforts and confuse the issue at every turn.” Yet Ellwanger suggests to Senator Keith, “If you have a clear choice between having grassroots leaders of this statewide bill promotion effort to be ministerial or non-ministerial, be sure to opt for the non-ministerial. It does the bill effort no good to have ministers out there in the public forum and the adversary will surely pick at this point Ministerial persons can accomplish a tremendous amount of work from behind the scenes, encouraging their congregations to take the organizational and P.R. initiatives. And they can lead their churches in storming Heaven with prayers for help against so tenacious an adversary.” (Unnumbered attachment to Ellwanger Depo. at 1.)
 

 Ellwanger shows a remarkable degree of political candor, if not finesse, in a letter to State Senator Joseph Carlucci of Florida:
 

 “2. It would be very wise, if not actually essential, that all of us who are engaged in this legislative effort be careful not to present our position and our work in a religious framework. For example, in written communications that might somehow be shared with those other persons whom we may be trying to convince, it
 
 *1256
 
 would be well to exclude our own personal testimony and/or witness for Christ, but rather, if we are so moved, to give that testimony on a separate attached note.” (Unnumbered attachment to Ellwanger Depo. at 1.)
 

 The same tenor is reflected in a letter by Ellwanger to Mary Ann Miller, a member of FLAG (Family, Life, America under God) who lobbied the Arkansas Legislature in favor of Act 590:
 

 “. . . we’d like to suggest that you and your co-workers be very cautious about mixing creation-science with creation-religion . . . Please urge your co-workers not to allow themselves to get sucked into the ‘religion’ trap of mixing the two together, for such mixing does incalculable harm to the legislative thrust. It could even bring public opinion to bear adversely upon the higher courts that will eventually have to pass judgment on the constitutionality of this new law.” (Ex. 1 to Miller Depo.)
 

 Perhaps most interesting, however, is Mr. Ellwanger’s testimony in his deposition as to his strategy for having the model act implemented:
 

 Q. You’re trying to play on other people’s religious motives.
 

 A. I’m trying to play on their emotions, love, hate, their likes, dislikes, because I don’t know any other way to involve, to get humans to become involved in human endeavors. I see emotions as being a healthy and legitimate means of getting people’s feelings into action, and ... I believe that the predominance of population in America that represents the greatest potential for taking some kind of action in this area is a Christian community. I see the Jewish community as far less potential in taking action . . . but I’ve seen a lot of interest among Christians and I feel, why not exploit that to get the bill going if that’s what it takes. (Ellwanger Depo. at 146-147.)
 

 Mr. Ellwanger’s ultimate purpose is revealed in the closing of his letter to Mr. Tom Bethell: “Perhaps all this is old hat to you, Tom, and if so, I’d appreciate your telling me so and perhaps where you’ve heard it before — the idea of killing evolution instead of playing these debating games that we’ve been playing for nigh over a decade already.” (Unnumbered at-, tachment to Ellwanger Depo. at 3.)
 

 It was out of this milieu that Act 590 emerged. The Reverend W. A. Blount, a Biblical literalist who is pastor of a church in the Little Rock area and was, in February, 1981, chairman of the Greater Little Rock Evangelical Fellowship, was among those who received a copy of the model act from Ellwanger.
 
 [12]
 

 At Reverend Blount’s request, the Evangelical Fellowship unanimously adopted a resolution to seek introduction of Ellwanger’s act in the Arkansas Legislature. A committee composed of two ministers, Curtis Thomas and W. A. Young, was appointed to implement the resolution. Thomas obtained from Ellwanger a revised copy of the model act which he transmitted to Carl Hunt, a business associate of Senator James L. Hoisted, with the request that Hunt prevail upon Hoisted to introduce the act.
 

 Hoisted, a self-described “born again” Christian Fundamentalist, introduced the act in the Arkansas Senate. He did not consult the State Department of Education, scientists, science educators or the Arkansas Attorney General.
 
 [13]
 
 The Act was not referred to any Senate committee for hearing and was passed after only a few minutes’ discussion on the Senate floor. In the House of Representatives, the bill was referred to the Education Committee which conducted a perfunctory fifteen minute
 
 *1257
 
 hearing. No scientist testified at the hearing, nor was any representative from the State Department of Education called to testify.
 

 Ellwanger’s model act was enacted into law in Arkansas as Act 590 without amendment or modification other than minor typographical changes. The legislative “findings of fact” in Ellwanger’s act and Act 590 are identical, although no meaningful fact-finding process was employed by the General Assembly.
 

 Ellwanger’s efforts in preparation of the model act and campaign for its adoption in the states were motivated by his opposition to the theory of evolution and his desire to see the Biblical version of creation taught in the public schools. There is no evidence that the pastors, Blount, Thomas, Young or The Greater Little Rock Evangelical Fellowship were motivated by anything other than their religious convictions when proposing its adoption or during their lobbying efforts in its behalf. Senator Holsted’s sponsorship and lobbying efforts in behalf of the Act were motivated solely by his religious beliefs and desire to see the Biblical version of creation taught in the public schools.
 
 [14]
 
 .
 

 The State of Arkansas, like a number of states whose citizens have relatively homogeneous religious beliefs, has a long history of official opposition to evolution which is motivated by adherence to Fundamentalist beliefs in the inerrancy of the Book of Genesis. This history is documented in Justice Fortas’ opinion in
 
 Epperson v. Arkansas,
 
 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), which struck down Initiated Act 1 of 1929, Ark.Stat.Ann. §§ 80-1627-1628, prohibiting the teaching of the theory of evolution. To this same tradition may be attributed Initiated Act 1 of 1930, Ark.Stat.Ann. § 80-1606 (Repl.1980), requiring “the reverent daily reading of a portion of the English Bible” in every public school classroom in the State.
 
 [15]
 

 It is true, as defendants argue, that courts should look to legislative statements of a statute’s purpose in Establishment Clause cases and accord such pronouncements great deference. See, e.g.,
 
 Committee for Public Education & Religious Liberty v. Nyquist,
 
 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) and
 
 McGowan v. Maryland,
 
 366 U.S. 420, 445, 81 S.Ct. 1101, 1115, 6 L.Ed.2d 393 (1961). Defendants also correctly state the principle that remarks by the sponsor or author of a bill are not considered controlling in analyzing legislative intent. See, e.g.,
 
 United States v. Emmons,
 
 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) and
 
 Chrysler Corp. v. Brown,
 
 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).
 

 Courts are not bound, however, by legislative statements of purpose or legislative disclaimers.
 
 Stone v. Graham,
 
 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980);
 
 Abington School Dist. v. Schempp,
 
 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). In determining the legislative purpose of a statute, courts may consider evidence of the historical context of the Act,
 
 Epperson v. Arkansas,
 
 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the specific sequence of events leading up to passage of the Act, departures from normal procedural sequences, substantive departures from the normal,
 
 Village of Arlington Heights v. Metropolitan Housing Corp.,
 
 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and contemporaneous statements of the legisla
 
 *1258
 
 tive sponsor,
 
 Fed. Energy Admin. v. Algonquin SNG, Inc.,
 
 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976).
 

 The unusual circumstances surrounding the passage of Act 590, as well as the substantive law of the First Amendment, warrant an inquiry into the stated legislative purposes. The author of the Act had publicly proclaimed the sectarian purpose of the proposal. The Arkansas resir dents who sought legislative sponsorship of the bill did so for a purely sectarian purpose. These circumstances alone may not be particularly persuasive, but when considered with the publicly announced motives of the legislative sponsor made contemporaneously with the legislative process; the lack of any legislative investigation, debate or consultation with any educators or scientists; the unprecedented intrusion in school curriculum;
 
 [16]
 
 and official history of the State of Arkansas on the subject, it is obvious that the statement of purposes has little, if any, support in fact. The State failed to produce any evidence which would warrant an inference or conclusion that at any point in the process anyone considered the legitimate educational value of the Act. It was simply and purely an effort to introduce the Biblical version of creation into the public school curricula. The only inference which can be drawn from these circumstances is that the Act was passed with the specific purpose by the General Assembly of advancing religion. The Act therefore fails the first prong of the three-pronged test, that of secular legislative purpose, as articulated in
 
 Lemon v. Kurtzman, supra,
 
 and
 
 Stone v. Graham, supra.
 

 III.
 

 If the defendants are correct and the Court is limited to an examination of the language of the Act, the evidence is overwhelming that both the purpose and effect of Act 590 is the advancement of religion in the public schools.
 

 Section 4 of the Act provides:
 

 Definitions. As used in this Act:
 

 (a) “Creation-science” means the scientific evidences for creation and inferences from those scientific evidences. Creation-science includes the scientific evidences and related inferences that indicate: (1) Sudden creation of the universe, energy, and life from nothing; (2) The insufficiency of mutation and natural selection in bringing about development of all living kinds from a single organism; (3) Changes only within fixed limits of originally created kinds of plants and animals; (4) Separate ancestry for man and apes; (5) Explanation of the earth’s geology by catastrophism, including the occurrence of a worldwide flood; and (6) A relatively recent inception of the earth and living kinds.
 

 (b) “Evolution-science” means the scientific evidences for evolution and inferences from those scientific evidences. Evolution-science includes the scientific evidences and related inferences that indicate: (1) Emergence by naturalistic processes of the universe from disordered matter and emergence of life from non-life; (2) The sufficiency of mutation and natural selection in bringing about development of present living kinds from simple earlier kinds; (3) Emergence by mutation and natural selection of present living kinds from simple earlier kinds; (4) Emergence of man from a common ancestor with apes; (5) Explanation of the earth’s geology and the evolutionary sequence by uniformitarianism; and (6) An inception several billion years ago of the earth and somewhat later of life.
 

 (c) “Public schools” mean public secondary and elementary schools.
 

 The evidence establishes that the definition of “creation science” contained in 4(a)
 
 *1259
 
 has as its unmentioned reference the first 11 chapters of the Book of Genesis. Among the many creation epics in human history, the account of sudden creation from nothing, or
 
 creatio ex nihilo,
 
 and subsequent destruction of the world by flood is unique to Genesis. The concepts of 4(a) are the literal Fundamentalists’ view of Genesis. Section 4(a) is unquestionably a statement of religion, with the exception of 4(a)(2) which is a negative thrust aimed at what the creationists understand to be the theory of evolution.
 
 [17]
 

 Both the concepts and wording of Section 4(a) convey an inescapable religiosity. Section 4(aXl) describes “sudden creation of the universe, energy and life from nothing.” Every theologian who testified, including defense witnesses, expressed the opinion that the statement referred to a supernatural creation which was performed by God.
 

 Defendants argue that: (1) the fact that 4(a) conveys ideas similar to the literal interpretation of Genesis does not make it conclusively a statement of religion; (2) that reference to a creation from nothing is not necessarily a religious concept since the Act only suggests a creator who has power, intelligence and a sense of design and not necessarily the attributes of love, compassion and justice;
 
 [18]
 
 and (3) that simply teaching about the concept of a creator is not a religious exercise unless the student is required to make a commitment to the concept of a creator.
 

 The evidence fully answers these arguments. The ideas of 4(a)(1) are not merely similar to the literal interpretation of Genesis; they are identical and parallel to no other story of creation.
 
 [19]
 

 The argument that creation from nothing in 4(a)(1) does not involve a supernatural deity has no evidentiary or rational support. To the contrary, “creation out of nothing” is a concept unique to Western religions. In traditional Western religious thought, the conception of a creator of the world is a conception of God. Indeed, creation of the world “out of nothing” is the ultimate religious statement because God is the only actor. As Dr. Langdon Gilkey noted, the Act refers to one who has the power to bring all the universe into existence from nothing. The only “one” who has this power is God.
 
 [20]
 

 The leading creationist writers, Morris and Gish, acknowledge that the idea of creation described in 4(a)(1) is the concept of creation by God and make no pretense to
 
 *1260
 
 the contrary.
 
 [21]
 
 The idea of sudden creation from nothing, or
 
 creatio ex nihilo,
 
 is an inherently religious concept. (Vawter, Gil-key, Geisler, Ayala, Blount, Hicks.)
 

 The argument advanced by defendants’ witness, Dr. Norman Geisler, that teaching the existence of God is not religious unless the teaching seeks a commitment, is contrary to common understanding and contradicts settled case law.
 
 Stone v. Graham,
 
 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980);
 
 Abington School District v. Schempp,
 
 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).
 

 The facts that creation science is inspired by the Book of Genesis and that Section 4(a) is consistent with a literal interpretation of Genesis leave no doubt that a major effect of the Act is the advancement of particular religious beliefs. The legal impact of this conclusion will be discussed further at the conclusion of the Court’s evaluation of the scientific merit of creation science. •
 

 IV. (A)
 

 The approach to teaching “creation science” and “evolution science” found in Act 590 is identical to the two-model approach espoused by the Institute for Creation Research and is taken almost verbatim from ICR writings. It is an extension of Fundamentalists’ view that one must either accept the literal interpretation of Genesis or else believe in the godless system of evolution.
 

 The two model approach of the creationists is simply a contrived dualism
 
 [22]
 
 which has no scientific factual basis or legitimate educational purpose. It assumes only two explanations for the origins of life and existence of man, plants and animals: It was either the work of a creator or it was not. Application of these two models, according to creationists, and the defendants, dictates that all scientific evidence which fails to support the theory of evolution is necessarily scientific evidence in support of creationism and is, therefore, creation science “evidence” in support of Section 4(a).
 

 IV. (B)
 

 The emphasis on origins as an aspect of the theory of evolution is peculiar to creationist literature. Although the subject of origins of life is within the province of biology, the scientific community does not consider origins of life a part of evolutionary theory. The theory of evolution assumes the existence of life and is directed to an explanation of
 
 how
 
 life evolved. Evolution does not presuppose the absence of a creator or God and the plain inference conveyed by Section 4 is erroneous.
 
 [23]
 

 
 *1261
 
 As a statement of the theory of evolution, Section 4(b) is simply a hodgepodge of limited assertions, many of which are factually inaccurate.
 

 For example, although 4(b)(2) asserts, as a tenet of evolutionary theory, “the sufficiency of mutation and natural selection in bringing about the existence of present living kinds from simple earlier kinds,” Drs. Ayala and Gould both stated that biologists know that these two processes do not account for all significant evolutionary change. They testified to such phenomena as recombination, the founder effect, genetic drift and the theory of punctuated equilibrium, which are believed to play important evolutionary roles. Section 4(b) omits any reference to these. Moreover, 4(b) utilizes the term “kinds” which all scientists said is not a word of science and has no fixed meaning. Additionally, the Act presents both evolution and creation science as “package deals.” Thus, evidence critical of some aspect of what the creationists define as evolution is taken as support for a theory which includes a worldwide flood and a relatively young earth.
 
 [24]
 

 IV. (C)
 

 In addition to the fallacious pedagogy of the two model approach, Section 4(a) lacks legitimate educational value because “creation science” as defined in that section is simply not science. Several witnesses suggested definitions of science. A descriptive definition was said to be that science is what is “accepted by the scientific community” and is “what scientists do.” The obvious implication of this description is that, in a free society, knowledge does not require the imprimatur of legislation in order to become science.
 

 More precisely, the essential characteristics of science are:
 

 (1) It is guided by natural law;
 

 (2) It has to be explanatory by reference to natural law;
 

 (3) It is testable against the empirical world;
 

 (4) Its conclusions are tentative, i.e., are not necessarily the final word; and
 

 (5) It is falsifiable. (Ruse and other science witnesses).
 

 Creation science as described in Section 4(a) fails to meet these essential characteristics. First, the section revolves around 4(a)(1) which asserts a sudden creation “from nothing.” Such a concept is not science because it depends upon a supernatural intervention which is not guided by natural law. It is not explanatory by reference to natural law, is not testable and is not falsifiable.
 
 [25]
 

 If the unifying idea of supernatural creation by God is removed from Section 4, the remaining parts of the section explain nothing and are meaningless assertions.
 

 Section 4(a)(2), relating to the “insufficiency of mutation and natural selection in bringing about development of all living kinds from a single organism”, is an incomplete negative generalization directed at the theory of evolution.
 

 Section 4(a)(3) which describes “changes only within fixed limits of originally created kinds of plants and animals” fails to conform to the essential characteristics of science for several reasons. First, there is no scientific definition of “kinds” and none of the witnesses was able to point to any scientific authority which recognized the term or knew how many “kinds” existed. One defense witness suggested there may be 100 to 10,000 different “kinds”. Another
 
 *1262
 
 believes there were “about 10,000, give or take a few thousand.” Second, the assertion appears to be an effort to establish outer limits of changes within species. There is no scientific explanation for these limits which is guided by natural law and the limitations, whatever they are, cannot be explained by natural law.
 

 The statement in 4(a)(4) of “separate ancestry of man and apes” is a bald assertion. It explains nothing and refers to no scientific fact or theory.
 
 [26]
 

 Section 4(a)(5) refers to “explanation of the earth’s geology by catastrophism, including the occurrence of a worldwide flood.” This assertion completely fails as science. The Act is referring to the Noachian flood described in the Book of Genesis.
 
 [27]
 
 The creationist writers concede that
 
 my
 
 kind of Genesis Flood depends upon supernatural intervention. A worldwide flood as an explanation of the world’s geology is not the product of natural law, nor can its occurrence be explained by natural law.
 

 Section 4(a)(6) equally fails to meet the standards of science. “Relatively recent inception” has no scientific meaning. It can only be given meaning by reference to creationist writings which place the age at between 6,000 and 20,000 years because of the genealogy of the Old Testament. See, e.g. Px 78, Gish (6,000 to 10,000); Px 87, Segraves (6,000 to 20,000). Such a reasoning process is not the product of natural law; not explainable by natural law; nor is it tentative.
 

 Creation science, as defined in Section 4(a), not only fails to follow the canons defining scientific theory, it also fails to fit the more general descriptions of “what scientists think” and “what scientists do.” The scientific community consists of individuals and groups, nationally and internationally, who work independently in such varied fields as biology, paleontology, geology and astronomy. Their work is published and subject to review and testing by their peers. The journals for publication are both numerous and varied. There is, however, not one recognized scientific journal which has published an article espousing the creation science theory described in Section 4(a). Some of the State’s witnesses suggested that the scientific community was “close-minded” on the subject of creationism and that explained the lack of acceptance of the creation science arguments. Yet no witness produced a scientific article for which publication had been refused. Perhaps some members of the scientific community are resistant to new ideas. It is, however, inconceivable that such a loose knit group of independent thinkers in all the varied fields of science could, or would, so effectively censor new scientific thought.
 

 The creationists have difficulty maintaining among their ranks consistency in the claim that creationism is science. The author of Act 590, Ellwanger, said that neither evolution nor creationism was science. He thinks both are religion. Duane Gish recently responded to an article in
 
 Discover
 
 critical of creationism by stating:
 

 “Stephen Jay Gould states that creationists claim creation is a scientific theory. This is a false accusation. Creationists have repeatedly stated that neither creation nor evolution is a scientific theory (and each is equally ■ religious).” Gish, letter to editor of
 
 Discover,
 
 July, 1981, App. 30 to Plaintiffs’ Pretrial Brief.
 

 The methodology employed by creationists is another factor which is indicative that their work is not science. A scientific theory must be tentative and always subject to revision or abandonment in light of
 
 *1263
 
 facts that are inconsistent with, or falsify, the theory. A theory that is by its own terms dogmatic, absolutist and never subject to revision is not a scientific theory.
 

 The creationists’ methods do not take data, weigh it against the opposing scientific data, and thereafter reach the conclusions stated in Section 4(a). Instead, they take the literal wording of the Book of Genesis and attempt to find scientific support for it. The method is best explained in the language of Morris in his book (Px 31)
 
 Studies in The Bible and Science
 
 at page 114:
 

 “. . . it is ... quite impossible to determine anything about Creation through a study of present processes, because present processes are not creative in character. If man wishes to know anything about Creation (the time of Creation, the duration of Creation, the order of Creation, the methods of Creation, or anything else) his sole source of true information is that of divine revelation. God was there when it happened. We were not there . . . Therefore, we are completely limited to what God has seen fit to tell us, and this information is in His written Word. This is our textbook on the science of Creation!”
 

 The Creation Research Society employs the same unscientific approach to the issue of creationism. Its applicants for membership must subscribe to the belief that the Book, of Genesis is “historically and scientifically true in all of the original autographs.”
 
 [28]
 
 The Court would never criticize or discredit any person’s testimony based on his or her religious beliefs. While anybody is free to approach a scientific inquiry in any fashion they choose, they cannot properly describe the methodology used as scientific, if they start with a conclusion and refuse to change it regardless of the evidence developed during the course of the investigation.
 

 IV. (D)
 

 In efforts to establish “evidence” in support of creation science, the defendants relied upon the same false premise as the two model approach contained in Section 4, i.e., all evidence which criticized evolutionary theory was proof in support of creation science. For example, the defendants established that the mathematical probability of a chance chemical combination resulting in life from non-life is so remote that such an occurrence is almost beyond imagination. Those mathematical facts, the defendants argue, are scientific evidences that life was the product of a creator. While the statistical figures may be impressive evidence against the theory of chance chemical combinations as an explanation of origins, it requires a leap of faith to interpret those figures so as to support a complex doctrine which includes a sudden creation from nothing, a worldwide flood, separate ancestry of man and apes, and a young earth.
 

 The defendants’ argument would be more persuasive if, in fact, there were only two theories or ideas about the origins of life and the world. That there are a number of theories was acknowledged by the State’s witnesses, Dr. Wickramasinghe and Dr. Geisler. Dr. Wickramasinghe testified at length in support of a theory that life on earth was “seeded” by comets which delivered genetic material and perhaps organisms to the earth’s surface from interstellar dust far outside the solar system. The “seeding” theory further hypothesizes that the earth remains under the continuing influence of genetic material from space which continues to affect life. While Wickramasinghe’s theory
 
 [29]
 
 about the origins of life on earth has not received general acceptance within the scientific community, he has, at least, used scientific methodology to produce a theory of origins which meets the essential characteristics of science.
 

 Perhaps Dr. Wickramasinghe was called as a witness because he was generally critical of the theory of evolution and the scientific community, a tactic consistent with the strategy of the defense. Unfortunately for the defense, he demonstrated that the sim
 
 *1264
 
 plistic approach of the two model analysis of the origins of life is false. Furthermore, he corroborated the plaintiffs’ witnesses by concluding that “no rational scientist” would believe the earth’s geology could be explained by reference to a worldwide flood or that the earth was less than one million years old.
 

 The proof in support of creation science consisted almost entirely of efforts to discredit the theory of evolution through a rehash of data and theories which have been before the scientific community for decades. The arguments asserted by creationists are not based upon new scientific evidence or laboratory data which has been ignored by the scientific community.
 

 Robert Gentry’s discovery of radioactive polonium haloes in granite and coalified woods is, perhaps, the most recent scientific work which the creationists use as argument for a “relatively recent inception” of the earth and a “worldwide flood.” The existence of polonium haloes in granite and coalified wood is thought to be inconsistent with radiometric dating methods based upon constant radioactive decay rates. Mr. Gentry’s findings were published almost ten years ago and have been the subject of some discussion in the scientific community. The discoveries have not, however, led to the formulation of any scientific hypothesis or theory which would explain a relatively recent inception of the earth or a worldwide flood. Gentry’s discovery has been treated as a minor mystery which will eventually be explained. It may deserve further investigation, but the National Science Foundation has not deemed it to be of sufficient import to support further funding.
 

 The testimony of Marianne Wilson was persuasive evidence that creation science is not science. Ms. Wilson is in charge of the science curriculum for Pulaski County Special School District, the largest school district in the State of Arkansas. Prior to the passage, of Act 590, Larry Fisher, a science teacher in the District, using materials from the ICR, convinced the School Board that it should voluntarily adopt creation science as part of its science curriculum. The District Superintendent assigned Ms. Wilson the job of producing a creation science curriculum guide. Ms. Wilson’s testimony about the project was particularly convincing because she obviously approached the assignment with an open mind and no preconceived notions about the subject. She had not heard of creation science until about a year ago and did not know its meaning before she began her research.
 

 Ms. Wilson worked with a committee of science teachers appointed from the District. They reviewed practically all of the creationist literature. Ms. Wilson and the committee members reached the unanimous conclusion that creationism is not science; it is religion. They so reported to the Board. The Board ignored the recommendation and insisted that a curriculum guide be prepared.
 

 In researching the subject, Ms. Wilson sought the assistance of Mr. Fisher who initiated the Board action and asked professors in the science departments of the University of Arkansas at Little Rock and the University of Central Arkansas
 
 [30]
 
 for reference material and assistance, and attended a workshop conducted at Central Baptist College by Dr. Richard Bliss of the ICR staff. Act 590 became law during the course of her work so she used Section 4(a) as a format for her curriculum guide.
 

 Ms. Wilson found all available creationists’ materials unacceptable because they were permeated with religious references and reliance upon religious beliefs.
 

 It is easy to understand why Ms. Wilson and other educators find the creationists’ textbook material and teaching guides unacceptable. The materials misstate the theory of evolution in the same fashion as Section 4(b) of the Act, with emphasis on the alternative mutually exclusive nature of creationism and evolution. Students are constantly encouraged to compare and
 
 *1265
 
 make a choice between the two models, and the material is not presented in an accurate manner.
 

 A typical example is
 
 Origins
 
 (Px 76) by Richard B. Bliss, Director of Curriculum Development of the ICR. The presentation begins with a chart describing “preconceived ideas about origins” which suggests that some people believe that evolution is atheistic. Concepts of evolution, such as “adaptive radiation,” are erroneously presented. At page 11, figure 1.6, of the text, a chart purports to illustrate this “very important” part of the evolution model. The chart conveys the idea that such diverse mammals as a whale, bear, bat and monkey all evolved from a shrew through the process of adaptive radiation. Such a suggestion is, of course, a totally erroneous and misleading application of the theory. Even more objectionable, especially when viewed in light of the emphasis on asking the student to elect one of the models, is the chart presentation at page 17, figure 1.6. That chart purports to illustrate the evolutionists’ belief that man evolved from bacteria to fish to reptile to mammals and, thereafter, into man. The illustration indicates, however, that the mammal from which man evolved was a
 
 rat.
 

 Biology, A Search For Order in Complexi
 
 ty
 
 [31]
 
 is a high school biology text typical of creationists’ materials. The following quotations are illustrative:
 

 “Flowers and roots do not have a mind to have purpose of their own; therefore, this planning must have been done for them by the Creator.”
 

 -at page 12.
 

 “The exquisite beauty of color and shape in flowers exceeds the skill of poet, artist, and king. Jesus said (from Matthew’s gospel), ‘Consider the lilies of the field, how they grow; they toil not, neither do they spin . ..’”
 

 Px 129 at page 363.
 

 The “public school edition ’ texts written by creationists simply omit Biblical references but the content and message remain the same. For example,
 
 Evolution
 
 — The
 
 Fossils Say No\,
 

 [32]
 

 contains the following:
 

 Creation. By creation we mean the bringing into being by a supernatural Creator of the basic kinds of plants and animals by the process of sudden, or fiat, creation.
 

 We do not know how the Creator created, what processes He used,
 
 for He used processes which are not now operating anywhere in the natural universe:
 
 This is why we refer to creation as Special Creation. We cannot discover by scientific investigation anything about the creative processes used by the Creator.” -page 40
 

 Gish’s book also portrays the large majority of evolutionists as “materialistic atheists or agnostics.”
 

 Scientific Creationism
 
 (Public School Edition) by Morris, is another text reviewed by Ms. Wilson’s committee and rejected as unacceptable. The following quotes illustrate the purpose and theme of the text:
 

 Forword
 

 “Parents and youth leaders today, and even many scientists and educators, have become concerned about the prevalence and influence of evolutionary philosophy in modern curriculum. Not only is this system inimical to orthodox Christianity and Judaism, but also, as many are convinced, to a healthy society and true science as well.” at page iii.
 

 ******
 

 “The rationalist of course finds the concept of special creation insufferably naive, even ‘incredible’. Such a judgment, however, is warranted only if one categorically dismisses the existence of an omnipotent God.” at page 17.
 

 
 *1266
 
 Without using creationist literature, Ms. Wilson was unable to locate one genuinely scientific article or work which supported Section 4(a). In order to comply with the mandate of the Board she used such materials as an article from
 
 Readers Digest
 
 about “atomic clocks” which inferentially suggested that the earth was less than 4% billion years old. She was unable to locate any substantive teaching material for some parts of Section 4 such as the worldwide flood. The curriculum guide which she prepared cannot be taught and has no educational value as science. The defendants did not produce any text or writing in response to this evidence which they claimed was usable in the public school classroom.
 
 [33]
 

 The conclusion that creation science has no scientific merit or educational value as science has legal significance in light of the Court’s previous conclusion that creation science has, as one major effect, the advancement of religion. The second part of the three-pronged test for establishment reaches only those statutes having as their
 
 primary
 
 effect the advancement of religion. Secondary effects which advance religion are not constitutionally fatal. Since creation science is not science, the conclusion is inescapable that the
 
 only
 
 real effect of Act 590 is the advancement of religion. The Act therefore fails both the first and second portions of the test in
 
 Lemon
 
 v.
 
 Kurtzman,
 
 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
 

 IV. (E)
 

 Act 590 mandates “balanced treatment” for creation science and evolution science. The Act prohibits instruction in any religious doctrine or references to religious writings. The Act is self-contradictory and compliance is impossible unless the public schools elect to forego significant portions of subjects such as biology, world history, geology, zoology, botany, psychology, anthropology, sociology, philosophy, physics and chemistry. Presently, the concepts of evolutionary theory as described in 4(b) permeate the public school textbooks. There is no way teachers can teach the Genesis account of creation in a secular manner.
 

 The State Department of Education, through its textbook selection committee, school boards and school administrators will be required to constantly monitor materials to avoid using religious references. The school boards, administrators and teachers face an impossible task. How is the teacher to respond to questions about a creation suddenly and out of nothing? How will a teacher explain the occurrence of a worldwide flood? How will a teacher explain the concept of a relatively recent age of the earth? The answer is obvious because the only source of this information is ultimately contained in the Book of Genesis.
 

 References to the pervasive nature of religious concepts in creation science texts amply demonstrate why State entanglement with religion is inevitable under Act 590. Involvement of the State in screening 'texts for impermissible religious references will require State officials to make delicate religious judgments. The need to monitor classroom discussion in order to uphold the Act’s prohibition against religious instruction will necessarily involve administrators in questions concerning religion. These continuing involvements of State officials in questions and issues of religion create an excessive and prohibited entanglement with religion.
 
 Brandon v. Board of Education,
 
 487 F.Supp. 1219, 1230 (N.D.N.Y.),
 
 aff’d.,
 
 635 F.2d 971 (2nd Cir. 1980).
 

 V.
 

 These conclusions are dispositive of the case and there is no need to reach legal
 
 *1267
 
 conclusions with respect to the remaining issues. The plaintiffs raised two other issues questioning the constitutionality of the Act and, insofar as the factual findings relevant to these issues are not covered in the preceding discussion, the Court will address these issues. Additionally, the defendants raised two other issues which warrant discussion.
 

 V. (A)
 

 First, plaintiff teachers argue the Act is unconstitutionally vague to the extent that they cannot comply with its mandate of “balanced” treatment without jeopardizing their employment. The argument centers around the lack of a precise definition in the Act for the word “balanced.” Several witnesses expressed opinions that the word has such meanings as equal time, equal weight, or equal legitimacy. Although the Act could have been more explicit, “balanced” is a word subject to ordinary understanding. The proof is not convincing that a teacher using a reasonably acceptable understanding of the word and making a good faith effort to comply with the Act will be in jeopardy of termination. Other portions of the Act are arguably vague, such as the “relatively recent” inception of the earth and life. The evidence establishes, however, that relatively recent means from 6,000 to 20,000 years, as commonly understood in creation science literature. The meaning of this phrase, like Section 4(a) generally, is, for purposes of the Establishment Clause, all too clear.
 

 V.. (B)
 

 The plaintiffs’ other argument revolves around the alleged infringement by the defendants upon the academic freedom of teachers and students. It is contended this unprecedented intrusion in the curriculum by the State prohibits teachers from teaching what they believe should be taught or requires them to teach that which they do not believe is proper. The evidence reflects that traditionally the State Department of Education, local school boards and administration officials exercise little, if any, influence upon the subject matter taught by classroom teachers. Teachers have been given freedom to teach and emphasize those portions of subjects the individual teacher considered important. The limits to this discretion have generally been derived from the approval of textbooks by the State Department and preparation of curriculum guides by the school districts.
 

 Several witnesses testified that academic freedom for the teacher means, in substance, that the individual teacher should be permitted unlimited discretion subject only to the bounds of professional ethics. The Court is not prepared to adopt such a broad view of academic freedom in the public schools.
 

 In any event, if Act 590 is implemented, many teachers will be required to teach material in support of creation science which they do not consider academically sound. Many teachers will simply forego teaching subjects which might trigger the “balanced treatment” aspects of Act 590 even though they think the subjects are important to a proper presentation of a course.
 

 Implementation of Act 590 will have serious and untoward consequences for students, particularly those planning to attend college. Evolution is the cornerstone of modern biology, and many courses in public schools contain subject matter relating to such varied topics as the age of the earth, geology and relationships among living things. Any student who is deprived of instruction as to the prevailing scientific thought on these topics will be denied a significant part of science education. Such a deprivation through the high school level would undoubtedly have an impact upon the quality of education in the State’s colleges and universities, especially including the pre-professional and professional programs in the health sciences.
 

 V. (C)
 

 The defendants argue in their brief that evolution is, in effect, a religion, and that by teaching a religion which is contrary to some students’ religious views, the
 
 *1268
 
 State is infringing upon the student’s free exercise rights under the First Amendment. Mr. Ellwanger’s legislative findings, which were adopted as a finding of fact by the Arkansas Legislature in Act 590, provides:
 

 “Evolution-science is contrary to the religious convictions or moral values or philosophical beliefs of many students and parents, including individuals of many different religious faiths and with diverse moral and philosophical beliefs.” Act 590, § 7(d).
 

 The defendants argue that the teaching of evolution alone presents both a free exercise problem and an establishment problem which can only be redressed by giving balanced treatment to creation science, which is admittedly consistent with some religious beliefs. This argument appears to have its genesis in a student note written by Mr. Wendell Bird, “Freedom of Religion and Science Instruction in Public Schools,” 87 Yale L.J. 515 (1978). The argument has no legal merit.
 

 If creation science is, in fact, science and not religion, as the defendants claim, it is difficult to see how the teaching of such a science could “neutralize” the religious nature of evolution.
 

 Assuming for the purposes of argument, however, that evolution is a religion or religious tenet, the remedy is to stop the teaching of evolution; not establish another religion in opposition to it. Yet it is clearly established in the case law, and perhaps also in common sense, that evolution is not a religion and that teaching evolution does not violate the Establishment Clause,
 
 Epperson v. Arkansas, supra; Willoughby v. Stever,
 
 No. 15574-75 (D.D.C. May 18, 1973);
 
 aff’d.
 
 504 F.2d 271 (D.C.Cir.1974),
 
 cert. denied,
 
 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975);
 
 Wright v. Houston Indep. School Disk,
 
 366 F.Supp. 1208 (S.D.Tex. 1978),
 
 aff’d.
 
 486 F.2d 137 (5th Cir. 1973),
 
 cert. denied
 
 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974).
 

 V. (D)
 

 The defendants presented Dr. Larry Parker, a specialist in devising curricula for public schools. He testified that the public school’s curriculum should reflect the subjects the public wants taught in schools. The witness said that polls indicated a significant majority of the American public thought creation science should be taught if evolution was taught. The point of this testimony was never placed in a legal context. No doubt a sizeable majority of Americans believe in the concept of a Creator or, at least, are not opposed to the concept and see nothing wrong with teaching school children about the idea.
 

 The application and content of First Amendment principles are not determined by public opinion polls or by a majority vote. Whether the proponents of Act 590 constitute the majority or the minority is quite irrelevant under a constitutional system of government. No group, no matter how large or small, may use the organs of government, of which the public schools are the most conspicuous and influential, to foist its religious beliefs on others.
 

 The Court closes this opinion with a thought expressed eloquently by the great Justice Frankfurter:
 

 “We renew our conviction that ‘we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion.’
 
 Everson v. Board of Education,
 
 330 U.S. at 59 [67 S.Ct. at 532]. If nowhere else, in the relation between Church and State, ‘good fences make good neighbors.’ ”
 
 McCollum v. Board of Education,
 
 333 U.S. 203, 232, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948).
 

 An injunction will be entered permanently prohibiting enforcement of Act 590.
 

 [1]
 

 . The complaint is based on 42 U.S.C. § 1983, which provides a remedy against any person who, acting under color of state law, deprives another of any right, privilege or immunity guaranteed by the United States Constitution or federal law.
 

 
 *1251
 
 This Court’s jurisdiction arises under 28 U.S.C. §§ 1331, 1343(3) and 1343(4). The power to issue declaratory judgments is expressed in 28 U.S.C. §§ 2201 and 2202.
 

 [2]
 

 . The facts necessary to establish the plaintiffs’ standing to sue are contained in the joint stipulation of facts, which is hereby adopted and incorporated herein by reference.
 

 There is no doubt that the case is ripe for adjudication.
 

 [3]
 

 . The State of Arkansas was dismissed as a defendant because of its immunity from suit under the Eleventh Amendment.
 
 Hans v. Louisiana,
 
 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
 

 [4]
 

 . The authorities differ as to generalizations which may be made about Fundamentalism. For example, Dr. Geisler testified to the widely held view that there are five beliefs characteristic of all Fundamentalist movements, in addition, of course, to the inerrancy of Scripture: (1) belief in the virgin birth of Christ, (2) belief in the deity of Christ, (3) belief in the substitutional atonement of Christ, (4) belief in the second coming of Christ, and (5) belief in the physical resurrection of all departed souls. Dr. Marsden, however, testified that this generalization, which has been common in religious scholarship, is now thought to be historical error. There is no doubt, however, that all Fundamentalists take the Scriptures as inerrant and probably most take them as literally true.
 

 [5]
 

 . Initiated Act 1 of 1929, Ark.Stat.Ann. § 80-1627
 
 et seq.,
 
 which prohibited the teaching of evolution in Arkansas schools, is discussed
 
 infra
 
 at text accompanying note 15.
 

 [6]
 

 . Subsequent references to the testimony will be made by the last name of the witness only. References to documentary exhibits will be by the name of the author and the exhibit number.
 

 [7]
 

 . Applicants for membership in the CRS must subscribe to the following statement of belief: “(1) The Bible is the written Word of God, and because we believe it to be inspired thruout (sic), all of its assertions are historically and scientifically true in all of the original autographs. To the student of nature, this means that the account of origins in Genesis is a factual presentation of simple historical truths. (2) All basic types of living things, including man, were made by direct creative acts of God during Creation Week as described in Genesis. Whatever biological changes have occurred since Creation have accomplished only changes within the original created kinds. (3) The great Flood described in Genesis, commonly referred to as the Noachian Deluge, was an historical event, world-wide in its extent and effect. (4) Finally, we are an organization of Christian men of science, who accept Jesus Christ as our Lord and Savior. The account of the special creation of Adam and Eve as one man and one woman, and their subsequent Fall into sin, is the basis for our belief in the necessity of a Savior for all mankind. Therefore, salvation can come only thru (sic) accepting Jesus Christ as our Savior.” (Px 115)
 

 [8]
 

 . Because of the voluminous nature of the documentary exhibits, the parties were directed by pre-trial order to submit their proposed exhibits for the Court’s convenience prior to trial. The numbers assigned to the pre-trial submissions do not correspond with those assigned to the same documents at trial and, in some instances, the pre-trial submissions are more complete.
 

 [9]
 

 . Px 130, Morris,
 
 Introducing Scientifíc Creationism Into the Public Schools
 
 (1975), and Bird, “Resolution for Balanced Presentation of Evolution and Scientific Creationism,”
 
 ICR Impact Series
 
 No. 71, App. 14 to Plaintiffs’ Pretrial Brief.
 

 [10]
 

 . The creationists often show candor in their proselytization. Henry Morris has stated, “Even if a favorable statute or court decision is
 
 *1255
 
 obtained, it will probably be declared unconstitutional, especially if the legislation or injunction refers to the Bible account of creation.” In the same vein he notes, “The only effective way to get creationism taught properly is to have it taught by teachers who are both willing and able to do it. Since most teachers now are neither willing nor able, they must first be both persuaded and instructed themselves.” Px 130, Morris,
 
 Introducing Scientific Creationism Into the Public Schools
 
 (1975) (unpaged).
 

 [11]
 

 . Mr. Bird sought to participate in this litigation by representing a number of individuals who wanted to intervene as defendants. The application for intervention was denied by this Court.
 
 McLean v. Arkansas,
 
 (E.D.Ark.1981), aff'd.
 
 per curiam,
 
 663 F.2d 47 (8th Cir. 1981).
 

 [12]
 

 . The model act had been revised to insert “creation science” in lieu of creationism because Ellwanger had the impression people thought creationism was too religious a term. (Ellwanger Depo. at 79.)
 

 [13]
 

 . The original model act had been introduced in the South Carolina Legislature, but had died without action after the South Carolina Attorney General had opined that the act was unconstitutional.
 

 [14]
 

 . Specifically, Senator Hoisted testified that he holds to a literal interpretation of the Bible; that the bill was compatible with his religious beliefs; that the bill does favor the position of literalists; that his religious convictions were a factor in his sponsorship of the bill; and that he stated publicly to the
 
 Arkansas Gazette
 
 (although not on the floor of the Senate) contemporaneously with the legislative debate that the bill does presuppose the existence of a divine creator. There is no doubt that Senator Holst-ed knew he was sponsoring the teaching of a religious doctrine. His view was that the bill ■did not violate the First Amendment because, as he saw it, it did not favor one denomination over another.
 

 [15]
 

 . This statute is, of course, clearly unconstitutional under the Supreme Court’s decision in
 
 Abington School Dist. v. Schempp,
 
 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).
 

 [16]
 

 . The joint stipulation of facts establishes that the following areas are the only
 
 information
 
 specifically required by statute to be taught in all Arkansas schools: (1) the effects of alcohol and narcotics on the human body, (2) conserva-' tion of national resources, (3) Bird Week, (4) Fire Prevention, and (5) Flag etiquette. Additionally, certain specific courses, such as American history and Arkansas history, must be completed by each student before graduation from high school.
 

 [17]
 

 . Paul Ellwanger stated in his deposition that he did not know why Section 4(a)(2) (insufficiency of mutation and natural selection) was included as an evidence supporting creation science. He indicated that he was not a scientist, “but these are the postulates that have been laid down by creation scientists.” Ellwanger Depo. at 136.
 

 [18]
 

 . Although defendants must make some effort to cast the concept of creation in non-religious terms, this effort surely causes discomfort to some of the Act’s more theologically sophisticated supporters. The concept of a creator God distinct from the God of love and mercy is closely similar to the Marcion and Gnostic heresies, among the deadliest to threaten the early Christian church. These heresies had much to do with development and adoption of the Apostle’s Creed as the official creedal statement of the Roman Catholic Church in the West. (Gil-key.)
 

 [19]
 

 . The parallels between Section 4(a) and Gen- • esis are quite specific: (1) “sudden creation from nothing” is taken from Genesis, 1:1-10 (Vawter, Gilkey); (2) destruction of the world by a flood of divine origin is a notion peculiar to Judeo-Christian tradition and is based on Chapters 7 and 8 of Genesis (Vawter); (3) the term “kinds” has no fixed scientific meaning, but appears repeatedly in Genesis (all scientific witnesses); (4) “relatively recent inception” means an age of the earth from 6,000 to 10,000 years and is based on the genealogy of the Old Testament using the rather astronomical ages assigned to the patriarchs (Gilkey and several of defendants’ scientific witnesses); (5) separate ancestry of man and ape focuses on the portion of the theory of evolution which Fundamentalists find most offensive,
 
 Epperson v. Arkansas,
 
 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).
 

 [20]
 

 . ”[C]oncepts concerning ... a supreme being of some sort are manifestly religious .. . These concepts do not shed that religiosity merely because they are presented as philosophy or as a science ...”
 
 Malnak v. Yogi,
 
 440 F.Supp. 1284, 1322 (D.N.J.1977);
 
 aff’d per curiam,
 
 592 F.2d 197 (3d Cir. 1979).
 

 [21]
 

 . See, e.g., Px 76, Morris, et al,
 
 Scientific Creationism,
 
 203 (1980) (“If creation really is a fact, this means there is a
 
 Creator,
 
 and the universe is His creation.”) Numerous other examples of such admissions can be found in the many exhibits which represent creationist literature, but no useful purpose would be served here by a potentially endless listing.
 

 [22]
 

 . Morris, the Director of ICR and one who first advocated the two model approach, insists that a true Christian cannot compromise with the theory of evolution and that the Genesis version of creation and the theory of evolution are mutually exclusive. Px 31, Morris,
 
 Studies in the Bible & Science,
 
 102-103. The two model approach was the subject of Dr. Richard Bliss’s doctoral dissertation. (Dx 35). It is presented in Bliss,
 
 Origins: Two Models-Evolution, Creation
 
 (1978). Moreover, the two model approach merely casts in educationalist language the dualism which appears in all creationist literature — creation (i.e. God) and evolution are presented as two alternative and mutually exclusive theories. See, e.g., Px 75, Morris,
 
 Scientific Creationism
 
 (1974) (public school edition); Px 59, Fox,
 
 Fossils: Hard Facts from the Earth.
 
 Particularly illustrative is Px 61, Boardman,
 
 et al, Worlds Without End
 
 (1971), a CSRC publication; “One group of scientists, known as creationists, believe that God, in a miraculous manner, created all matter and energy . . .
 

 “Scientists who insist that the universe just grew, by accident, from a mass of hot gases without the direction or help of a Creator are known as evolutionists.”
 

 [23]
 

 . The idea that belief in a creator and acceptance of the scientific theory of evolution are mutually exclusive is a false premise and offensive to the religious views of many. (Hicks) Dr. Francisco Ayala, a geneticist of considerable renown and a former Catholic priest who has the equivalent of a Ph.D. in theology, pointed out that many working scientists who subscribed to the theory of evolution are devoutly religious.
 

 [24]
 

 . This is so despite the fact that some of the defense witnesses do not subscribe to the young earth or flood hypotheses. Dr. Geisler stated his belief that the earth is several billion years old. Dr. Wickramasinghe stated that no rational scientist would believe the earth is less than one million years old or that all the world’s geology could be explained by a worldwide flood.
 

 [25]
 

 . “We do not know how God created, what processes He used, for
 
 God used processes which are not now operating anywhere in the natural universe.
 
 This is why we refer to divine creation as Special Creation. We cannot discover by scientific investigation anything about the creative processes used by God.” Px 78, Gish,
 
 Evolution? The Fossils Say
 
 No!, 42 (3d ed. 1979) (emphasis in original).
 

 [26]
 

 . The evolutionary notion that man and some modern apes have a common ancestor somewhere in the distant past has consistently been distorted by anti-evolutionists to say that man descended from modern monkeys. As such, this idea has long been most offensive to Fundamentalists. See,
 
 Epperson v. Arkansas,
 
 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).
 

 [27]
 

 . Not only was this point acknowledged by virtually all the defense witnesses, it is patent in the creationist literature. See, e.g., Px 89, Kofahl & Segraves, The Creation
 
 Explanation,
 
 40: “The Flood of Noah brought about vast changes in the earth’s surface, including vulcanism, mountain building, and the deposition of the major part of sedimentary strata. This principle is called ‘Biblical catastrophism.’ ”
 

 [28]
 

 . See n. 7,
 
 supra,
 
 for the full text of the CRS creed.
 

 [29]
 

 . The theory is detailed in Wickramasinghe’s book with Sir Fred Hoyle,
 
 Evolution From Space
 
 (1981), which is Dx 79.
 

 [30]
 

 . Ms.Wilson stated that some professors she spoke with sympathized with her plight and tried to help her find scientific materials to support Section 4(a). Others simply asked her to leave.
 

 [31]
 

 . Px 129, published by Zonderman Publishing House (1974), states that it was “prepared by the Textbook Committee of the Creation Research Society.” It has a disclaimer pasted inside the front cover stating that it is not suitable for use in public schools.
 

 [32]
 

 . Px 77, by Duane Gish.
 

 [33]
 

 . The passage of Act 590 apparently caught a number of its supporters off guard as much as it did the school district. The Act’s author, Paul Ellwanger, stated in a letter to “Dick,” (apparently Dr. Richard Bliss at ICR): “And finally,- if you know of any textbooks at any level and for any subjects that you think are acceptable to you and also constitutionally admissible, these are things that would be of
 
 enormous
 
 to these bewildered folks who may be caught, as Arkansas now has been, by the sudden need to implement a whole new ball game with which they are quite unfamiliar.” (sic) (Unnumbered attachment to Ellwanger depo.)